# Exhibit A

STATE OF NEW YORK
SUPREME COURT      ORANGE COUNTY

CITY OF NEWBURGH,

**SUMMONS**

       *Plaintiff,*

Index No.

      *v.*

AGC, INC., f/k/a Asashi Glass Co., AGC CHEMICALS
AMERICAS INC., AMEREX CORPORATION,
ARCHROMA MANAGEMENT LLC, ARKEMA INC.,
BASF CORPORATION, individually and as successor in
interest to Ciba Inc., CARRIER GLOBAL
CORPORATION, CHEMDESIGN PRODUCTS INC.,
CHEMICALS, INC., CLARIANT CORPORATION,
individually and as successor in interest to Sandoz Chemical
Corporation, CORTEVA, INC., individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, DEEPWATER CHEMICALS, INC., DUPONT
DE NEMOURS INC., individually and as successor in
interest to DuPont Chemical Solutions Enterprise, DYNAX
CORPORATION, E. I. DUPONT DE NEMOURS AND
COMPANY, individually and as successor in interest to
DuPont Chemical Solutions Enterprise, NATION FORD
CHEMICAL COMPANY, THE CHEMOURS COMPANY,
individually and as successor in interest to DuPont Chemical
Solutions Enterprise, THE CHEMOURS COMPANY FC,
LLC, individually and as successor in interest to DuPont
Chemical Solutions Enterprise, and DOE DEFENDANTS 1-
20, fictitious names whose present identities are unknown

      *Defendants.*

To the above-named Defendants:

      **YOU ARE HEREBY SUMMONED** to serve an Answer to the annexed Complaint on

the attorneys for Plaintiff within 20 days after the service of this Summons, exclusive of the day

of service (or within 30 days after the service is complete if this Summons is not personally

delivered to you within the State of New York); and in case of your failure to appear, judgment will be taken against you by default for the relief demanded in the Complaint.

Orange County is designated as the venue of this action because it is the location of Plaintiff, a municipal corporation with an address of 83 Broadway, Newburgh, New York 12550, the location of events or omissions giving rise to the claim occurred, and the location of the subject real property in Orange County.

Dated: Rochester, New York
July 8, 2023

**KNAUF SHAW LLP**
*Attorneys for Plaintiff*
Alan J. Knauf, Esq.,
Amy K. Kendall, Esq., and
Melissa Valle, Esq., of Counsel
2600 Innovation Square
100 South Clinton Avenue
Rochester, New York 14604
Tel: (585) 546-8430
aknauf@nyenvlaw.com
akendall@nyenvlaw.com
mvalle@nyenvlaw.com

To:
AGC, INC.
1-5-1, Marunouchi, Chiyoda-ku
Tokyo 100-8405 Japan

AGC CHEMICALS AMERICAS INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street Wilmington, DE 19801

AMEREX CORPORATION
James M. Proctor II
2900 Highway 280
Suite 300
Birmingham, AL 35223

ARCHROMA U.S. INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

ARKEMA INC.
900 First Avenue
King of Prussia, PA 19406

BASF CORPORATION
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CARRIER GLOBAL CORPORATION
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CHEMDESIGN PRODUCTS INC.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, New Castle, DE, 19808

CHEMICALS, INC.
 c/o Ashok K. Moza
12321 Hatcherville
Baytown, TX 77520

CLARIANT CORPORATION
c/o Corporation Service Company
8040 Excelsior Drive, Suite 400
Madison, WI 53717

CORTEVA, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DEEPWATER CHEMICALS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DUPONT DE NEMOURS INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DYNAX CORPORATION
c/o Corporate Systems LLC
3500 S. Dupont Highway
Dover, DE 19901

E. I. DUPONT DE NEMOURS AND COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

NATION FORD CHEMICAL COMPANY
c/o John A. Dickson, IV
2300 Bank Street
Fort Mill, SC 29715

THE CHEMOURS COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

THE CHEMOURS COMPANY FC, LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

STATE OF NEW YORK
SUPREME COURT        ORANGE COUNTY

---

CITY OF NEWBURGH,

       *Plaintiff,*

       *vs.*

AGC, INC., f/k/a Asashi Glass Co., AGC CHEMICALS
AMERICAS INC., AMEREX CORPORATION,
ARCHROMA MANAGEMENT LLC, ARKEMA INC.,
BASF CORPORATION, individually and as successor in
interest to Ciba Inc., CARRIER GLOBAL
CORPORATION, CHEMDESIGN PRODUCTS INC.,
CHEMICALS, INC., CLARIANT CORPORATION,
individually and as successor in interest to Sandoz Chemical
Corporation, CORTEVA, INC., individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, DEEPWATER CHEMICALS, INC., DUPONT
DE NEMOURS INC., individually and as successor in
interest to DuPont Chemical Solutions Enterprise, DYNAX
CORPORATION, E. I. DUPONT DE NEMOURS AND
COMPANY, individually and as successor in interest to
DuPont Chemical Solutions Enterprise, NATION FORD
CHEMICAL COMPANY, THE CHEMOURS COMPANY,
individually and as successor in interest to DuPont Chemical
Solutions Enterprise, THE CHEMOURS COMPANY FC,
LLC, individually and as successor in interest to DuPont
Chemical Solutions Enterprise, and DOE DEFENDANTS 1-
20, fictitious names whose present identities are unknown

       *Defendants.*

**COMPLAINT**

Index No.

---

    The City of Newburgh ("City" or "Plaintiff"), by and through its attorneys **KNAUF**

**SHAW LLP,** for its Complaint against Defendants AGC Chemicals Americas Inc., Amerex

Corporation, Arkema Inc., Archroma Management LLC, BASF Corporation, Carrier Global

Corporation, Chemdesign Products Inc., Chemicals, Inc., Clariant Corporation, Corteva, Inc.,

1

Deepwater Chemicals, Inc., Dupont De Nemours Inc., Dynax Corporation, E. I. Dupont De Nemours and Company, Nation Ford Chemical Company, The Chemours Company, The Chemours Company FC, LLC, and Doe Defendants 1-20, fictitious names whose identities are presently unknown (collectively "Defendants") and alleges, upon information and belief, as follows:

## GENERAL ALLEGATIONS

1.      Plaintiff brings this action as: 1) the owner of real property ("City Property")[1] in the Towns of New Windsor and Newburgh containing the Washington Lake Reservoir ("Washington Lake"), the primary water supply for the City, portions of the City's drinking water reservoir watershed ("City Watershed")[2], and other parts of the City's public water supply and distribution system ("City Water System"); 2) as a user of waters that flow through the City Watershed; and 3) as the operator of this public water supply system for City residents, businesses and other water users (together "City Water Users", as more fully described below.

2.      This action arises from the foreseeable contamination ("Contamination") of surface water, groundwater, soil and sediment resulting from the use of aqueous film-forming foam ("AFFF") products that contained per- and poly-fluoroalkyl substances ("PFAS") at New York Stewart International Airport ("Airport"), and Stewart Air National Guard Base ("Base").

3.      The Contamination continues to cause injury to the City Property, City Water System, City Watershed, and Washington Lake.

4.      PFAS, also referred to as perfluorinated chemicals ("PFCs"), are a family of synthetic chemicals containing fluorine and carbon atoms.

---

[1] The term "City Property" is defined below in paragraph 191.

[2] The term "City Watershed" is further defined below in paragraph 175.

5.      PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid, and are thus effective in products which require fire resistance, and oil, stain, grease, and water repellency.

6.      PFAS are or have been found in firefighting foams, wire insulation, cleaners, textiles, leather, paper, and paints.

7.      Upon information and belief, there have been at least hundreds of PFAS manufactured, distributed, and sold in the United States.

8.      The two most widely known and studied PFAS are PFOA and PFOS.

9.      PFOS, a perfluoralkyl sulfonate, is an environmentally persistent anthropogenic chemical that is produced synthetically.

10.      PFOA, a perfluoralkyl carboxylate, is an environmentally persistent anthropogenic chemical that is also produced synthetically.

11.      PFASs were first invented in the 1930s.

12.      In or about 1966, AFFF containing PFAS was patented as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and firefighting training facilities.

13.      PFASs are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain.  PFOS and PFOA are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

14.      At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFAS, and/or

3

designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or PFCs contained in AFFF (collectively, "AFFF/Component Products").

15. Defendants designed, manufactured, marketed, distributed, and/or sold AFFF/Component Products with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by Defendants.

16. Since its creation in the 1960s, AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants, and/or that contained fluorosurfactants and/or PFCs designed, manufactured, marketed, distributed, and/or sold by Defendants, used as directed and intended by Defendants, and subsequently released into the environment during fire protection, training, and response activities, resulting in widespread PFAS contamination.

17. Since the 1970s, the United States Armed Forces and civilian airports have been using AFFF to suppress fuel fires. AFFF contains both PFOS and PFOA and is commonly used by civilian firefighters as well.

18. Through this action, Plaintiff seeks compensatory damages for the harm done to its property and the costs associated with investigating, remediating and monitoring its watershed and water supply contaminated with PFAS due to the use of AFFF at the Airport and the Base.

## PARTIES

19. Plaintiff, The City of Newburgh, is a municipal corporation organized under the laws of New York with its principal place of business at 83 Broadway, Newburgh, New York 12550.

20. In carrying out its duties, Plaintiff is acting for the benefit of the public and for the protection of the health, welfare and prosperity of its customers.

4

21.     Defendant AGC, Inc. ("AGC, Inc.") f/k/a Asahi Glass Co., is a corporation organized under the laws of Japan that does business throughout the United States and has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

22.     Upon information and belief, AGC, Inc. was founded more than a hundred years ago and was the first Japanese producer of sheet glass.

23.     Upon information and belief, AGC, Inc. expanded its operations in the 1960s by developing a fluorochemical business segment that sold products such as the water and oil repellent agents AsahiGuard and fluoropolymer film F-CLEAN.

24.     Upon information and belief, AGC, Inc. designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

25.     Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation and does business throughout the United States. AGC has its principal place of business at 55 E. Uwchlan Ave., Suite 201, Exton, Pennsylvania 19341.

26.     Upon information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of Defendant AGC Inc.

27.     AGC manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

28.     Upon information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

29. Defendant Amerex Corporation ("Amerex") is an Alabama corporation and does business throughout the United States. Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, Alabama 35173.

30. Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

31. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

32. Upon information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

33. Defendant Archroma U.S. Inc. ("Archroma") is a North Carolina company and does business throughout the United States. Archroma has its principal place of business at 5435 77 Center Drive, #10 Charlotte, North Carolina 28217.

34. Upon information and belief, Archroma was formed in 2013 as part of the acquisition of Clariant Corporation's Textile Chemicals, Paper Specialties and Emulsions business by SK Capital Partners.

35. Upon information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

36. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation and does business throughout the United States. Arkema has its principal place of business at 900 1st

Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 12 of 136

Avenue, King of Prussia, Pennsylvania 19406. Upon information and belief, assets of Arkema's fluorochemical business were purchased by Defendant Dupont in 2002.

37.    Arkema develops specialty chemicals and polymers.

38.    Arkema is an operating subsidiary of Arkema France, S.A.

39.    Upon information and belief, Arkema designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

40.    Defendant BASF Corporation ("BASF") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

41.    Upon information and belief, BASF is the successor-in-interest to Ciba, Inc. (f/k/a Ciba Specialty Chemicals Corporation).

42.    Upon information and belief, Ciba Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFAS, and/or their chemical precursors for use in AFFF products.

43.    Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation and does business throughout the United States. Carrier has its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

44.    Upon information and belief, Carrier was formed in 2020 when United Technologies Corporation spun off its fire and security business before it merged with Raytheon Company in April 2020.

45.    Upon information and belief, Carrier designed, manufactured, marketed, distributed, and sold AFFF products containing PFOS, PFOA, and/or their chemical precursors.

7

46.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Delaware corporation and does business throughout the United States. ChemDesign has its principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

47.     Upon information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

48.     Defendant Chemicals, Inc. ("Chemicals") is a Texas corporation and does business throughout the United States. Chemicals has its principal place of business at 12321 Hatcherville Road, Baytown, Texas 77521.

49.     Upon information and belief, Chemicals supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

50.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

51.     Upon information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz").

52.     Upon information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

53.     Upon information and belief, Clariant supplied PFCs containing PFAS, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

8

54. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation and does business throughout the United States. Deepwater's principal place of business is at 196122 E County Road 735, Woodward, Oklahoma 73801.

55. Upon information and belief, Deepwater designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

56. Defendant Dynax Corporation ("Dynax") is a Delaware corporation that conducts business throughout the United States. Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

57. Upon information and belief, Dynax entered into the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

58. Upon information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

59. Defendant E. I. du Pont de Nemours and Company ("DuPont"), is a Delaware corporation and does business throughout the United States. DuPont has its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

60. Defendant The Chemours Company ("Chemours"), is a Delaware corporation and does business throughout the United States. Chemours has its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

9

Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 15 of 136

61.     In 2015, DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities which Chemours assumed, including those related to PFOS and PFOA and fluorosurfactants.

62.     Upon information and belief, Chemours has supplied fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors to manufacturers of AFFF products.

63.     Upon information and belief, Chemours was incorporated as a subsidiary of DuPont as of April 30, 2015. From that time until July 2015, Chemours was a wholly-owned subsidiary of DuPont.

64.     In July 2015, DuPont spun off Chemours and transferred to Chemours its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours stock to DuPont stockholders, and Chemours has since been an independent, publicly traded company.

65.     Defendant The Chemours Company FC, LLC ("Chemours FC"), is a Delaware corporation and does business throughout the United States. Chemours has its principal place of business at 1007 Market Street, Wilmington, Delaware 19899. Chemours FC is a subsidiary of The Chemours Company.

66.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that conducts business throughout the United States. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

67.     Defendant Du Pont de Nemours Inc. (f/k/a DowDuPont, Inc.) ("DowDuPont"), is a Delaware corporation and does business throughout the United States. DowDuPont has its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

10

68. Upon information and belief, DowDupont was created in 2015 to transfer Chemours and DuPont liabilities for manufacturing and distributing flourosurfactants to AFFF manufacturers.

69. On June 1, 2019, DowDupont separated its agriculture business through the spin-off of Corteva.

70. Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

71. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend.

72. Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

73. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

74. Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont Entities" throughout this Complaint.

75. Upon information and belief, DuPont Entities designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

11

76.     Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina company and does business throughout the United States. Nation Ford has its principal place of business at 2300 Banks Street, Fort Mill, South Carolina 29715.

77.     Upon and belief, Nation Ford supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

78.     Doe Defendants 1-20 are unidentified entities or persons whose names are presently unknown and whose actions, activities, omissions  (a) may have permitted, caused and/or contributed to the contamination of the City Watershed and/or the City Property, including but not limited to Washington Lake; or (b) may be vicariously responsible for entities or persons who permitted, caused and/or contributed to the contamination of the City Watershed and/or the City Property, including but not limited to Washington Lake; or (c) may be successors in interest to entities or persons who permitted, caused and/or permitted, contributed to the contamination of the City Watershed and/or the City Property, including but not limited to Washington Lake. After reasonable search and investigation to ascertain the Doe Defendants actual names, the Doe Defendants' actual identities are unknown to Plaintiff as upon information and belief they are not linked with any of the Defendants on any public source.

79.     The Doe Defendants 1-20 either in their own capacity or through a party they are liable for: (1) designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFOS, PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or PFCs contained in AFFF/Component Products; or (2) used, handled, transported, stored, discharged, disposed of, designed, manufactured, marketed, distributed, and/or sold PFOS, PFOA, and/or their chemical precursors, or other non-AFFF products containing PFOS, PFOA, and/or their chemical

12

precursors; or (3) failed to timely perform necessary and reasonable response and remedial measures to releases of PFOS, PFOA, and/or their chemical precursors, or other non-AFFF products containing PFOS, PFOA, and/or their chemical precursors in to the environment contaminating the City Watershed and/or the City Property, including Washington Lake.

80.     Defendants AGC, Inc., AGC, Archroma, ChemDesign, Chemicals, Clariant, Deepwater, Dupont Entities, and Nation Ford are collectively referred to in this Complaint as the "PFC Defendants."

81.     Upon information and belief, the PFC Defendants supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products containing PFAS, including but not limited to PFOA and PFOS, that were stored, handled, used, trained with, tested equipment with, were otherwise discharged and or disposed of at the Airport and/or the Base and which have contaminated the City Watershed, the City Property, and the City Water System.

82.     Defendants Amerex and Carrier are collectively referred to as "AFFF Defendants" in this Complaint.

83.     Upon information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS, that were stored, handled, used, trained with, tested equipment with, were otherwise discharged and or disposed of at the Airport and/or the Base and which have contaminated the City Watershed, the City Property, and the City Water System.

84.     Defendants Arkema, BASF, ChemDesign, Deepwater, Dupont Entities, and Dynax are collectively referred to in this Complaint as the "Fluorosurfactant Defendants."

13

85.     Upon information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, were otherwise discharged and or disposed of at the Airport and/or the Base and which have contaminated the City Watershed, the City Property, and the City Water System.

86.     All Defendants, at all times material herein, acted by and through their respective agents, servants, officers and employees, actual or ostensible, who then and there were acting within the course and scope of their actual or apparent agency, authority or duties. Defendants are liable based on such activities, directly and vicariously.

### JURISDICTION AND VENUE

87.     This Court has jurisdiction because Defendant Dynax Corporation's principal place of business is located at 103 Fairview Park Drive, Elmsford, New York 10523; and Defendant Clariant Corporation is a New York corporation.

88.     Venue is proper in Orange County because the Airport, the Base , the City Property, the City Watershed, and Washington Lake are located there, and because the events related to the claims in this Complaint occurred in Orange County.

89.     This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with New York, including, among other things, purposefully marketing, selling and/or distributing their AFFF/ Component products to and within New York, and because they have the requisite minimum contacts with New York necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

14

FILED: ORANGE COUNTY CLERK 07/08/2023 02:56 PM
NYSCEF DOC. NO. 2
Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 20 of 136

INDEX NO. EF004436-2023
RECEIVED NYSCEF: 07/08/2023

90.     This action is brought by Plaintiff as a public water supplier, and is timely because the applicable statute of limitations is CPLR §214-h.

91.     Plaintiff commenced and is prosecuting a lawsuit against other defendants arising out of the same nucleus of facts and many of the same legal theories as this case, in the United States District Court for the Southern District of New York, entitled *City of Newburgh v. United States of America, et al.*, Civil Action No. 7:18-cv-07057 *("Newburgh v. USA")*. That case has been joined in Multi-District Litigation in the United States District Court for the District of South Carolina, Charleston Division, entitled *In Re: Aqueous Film-forming Foams Products Liability Litigation*, MDL No. 2873 (the "AFFF MDL").

92.     Moreover, lawsuits and claims ("City Water User Claims") have been brought by alleged City Water Users against the City complaining, *inter alia*, that the City supplied deficient water, some of which were also transferred to the AFF MDL.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

**A.      PFOA and PFOS and Their Risk to Public Health**

93.     PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

94.     The two most widely studied types of these substances are PFOA and PFOS.

95.     PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

15

Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 21 of 136

96. PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

97. PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

98. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

99. PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

100. PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

101. The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

102. Exposure to PFAS is toxic and poses serious health risks to humans and animals.

103. PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

16

**B.    Defendants' Manufacture and Sale of AFFF/Component Products**

104.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

105.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

106.    AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

107.    Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

108.    AFFF can be made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

109.    AFFF that contains fluorosurfactants, however, is better at extinguishing hydrocarbon fuel-based fires due to their surface-tension lowering properties, essentially smothering the fire and starving it of oxygen.

110.    The fluorosurfactants used in other AFFF products sold by the AFFF Defendants were manufactured by the Fluorosurfactant Defendants through the process of telomerization.

111.    The PFCs that the Fluorosurfactant Defendants needed to manufacture those fluorosurfactants contained PFOS, PFOA, and/or their chemical precursors, and were designed, manufactured, marketed, distributed and/or sold by the PFC Defendants.

17

112.    Upon information and belief, the PFC and Fluorosurfactant Defendants were aware that the PFCs and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in the AFFF products designed, manufactured, marketed, distributed, and/or sold by the AFFF Defendants.

113.    Upon information and belief, the PFC and Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and/or sold the PFC and/or fluorosurfactants contained in the AFFF products discharged into the environment at the City of Newburgh during fire protection, training, and response activities, resulting in widespread PFAS contamination.

114.    Upon information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment during fire protection, training, and response activities, as well as during reasonably foreseeable accidental releases and spills, resulting in widespread PFAS contamination at the Airport, the Base, in the City Watershed and the City Water System and on the City Property.

## C. Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFAS

115.    Upon information and belief, by at least the 1970s DuPont knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

116.    Upon information and belief, DuPont concealed from the public and government agencies its knowledge of the threats to public health and the environment posed by PFAS.

117.    Some or all of the Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment after their first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

18

i. 1940s and 1950s: Early Warnings About the Persistence of AFFF

118.    In 1947, The 3M Company, f/k/a Minnesota Mining and Manufacturing Co. ("3M")[3], started its fluorochemical program, and within four years, it began selling its PFOA to DuPont.  The persistence and contaminating nature of the fluorosurfactants contained in AFFF products were understood prior to their commercial application at 3M's Cottage Grove facility in Minnesota.

119.    The inventor of 3M's patented process of electrochemical fluorination ("ECF") was J.H. Simons.  Simons' 1948 patent for the ECF process reported that PFCs are "non-corrosive, and of little chemical reactivity," and "do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures."[4]

120.    Simons further reported that fluorosurfactants produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. 3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[5]

121.    The thermal stability of 3M's fluorosurfactants was also understood prior to commercial production.  Simons' patent application further discloses that the fluorosurfactants produced by the ECF process were thermally stable at temperatures up to 750° C (1382º F).

---

[3] 3M was sued by the City of Newburgh in *Newburgh v. USA*.

[4] Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf.

[5] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, *available* at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.

19

Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds.[6]

122. Nowhere in any Material Safety Data Sheet for any of Defendants' AFFF/Component Products is information on the thermal stability of those products disclosed. Failure to disclose knowledge of the stability of the PFCs and fluorosurfactants used in AFFF products to customers is a failure to warn just how indestructible the AFFF's ingredients are when released to unprotected water sources and even treatment plants.

<u>ii. 1960s: AFFF's Environmental Hazards Come into Focus</u>

123. By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

124. One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[7] Thus, 3M knew by the mid-1960s that its surfactants were immune to chemical and biological degradation in soils and groundwater.

125. 3M also knew by 1964 that when dissolved, fluorocarbon carboxylic acids and fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions. Later studies by 3M on the adsorption and mobility of FC-95 and FC-143

---

[6] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

[7] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964), available at https://www.ag .state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

(the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[8]

### iii.  1970s: Internal Studies Provide Evidence of Environmental and Health Risks

126.    Upon information and belief, by the mid-1970s, some Defendants had an intimate understanding of the persistent nature of PFCs.  A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS.

127.    In 1977, The Ansul Company[9] ("Ansul") authored a report titled "Environmentally Improved AFFF," which acknowledged that releasing AFFF into the environment could pose potential negative impacts to groundwater quality.[10]  Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic . . . improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness."  Thus, Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet there is no evidence that Ansul (or any other Defendant) ever pursued initiatives to do so.

128.    A 1978 3M biodegradation study likewise reported that an "extensive study strongly suggest[ed]" one of its PFCs is "likely to persist in the environment for extended period unaltered by metabolic attack."[11]  A year later, a 3M study reported that one of its fluorosurfactants

---

[8] Technical Report Summary re : Adsorption of FC 95 and FC143 on Soil, Feb. 27, 1978, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

[9] Ansul was sued by the City of Newburgh in *Newburgh v. USA*.

[10] Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977, *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/a050508.pdf.

[11] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - II, Jan. 1, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf.

21

"was found to be completely resistant to biological test conditions," and that it appeared waterways were the fluorosurfactant's "environmental sink."[12]

129.    In 1979, 3M also completed a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[13]  More than a decade after 3M began selling AFFF containing fluorosurfactants it wrote: "there has been a general lack of knowledge relative to the environmental impact of these chemicals."  The report ominously asked, "If these materials are not biodegradable, what is their fate in the environment?"

130.    During the 1970s, 3M also learned that the fluorosurfactants used in AFFF accumulated in the human body and were "even more toxic" than previously believed.

131.    In 1975, 3M learned that PFAS was present in the blood of the general population.[14] Since PFOA and PFOS are not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of this PFOS.  The finding also should have alerted 3M to the possibility that PFOS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain how PFOS from 3M's products ended up in human blood.

132.    In 1976, 3M found PFAS in the blood of its workers at levels "up to 1000 times 'normal' amounts of organically bound fluorine in their blood."[15]  This finding should have alerted 3M to the same issues raised by the prior year's findings.

---

[12] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - III, July 19, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX 1179.pdf.

[13] Technical Report Summary, Final Comprehensive Report on FM 3422, Feb. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2563.pdf.

[14] Memorandum from G.H. Crawford to L.C. Krogh et al. re: Fluorocarbons in Human Blood Plasma, Aug. 20, 1975, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1118.pdf.

[15] 3M Chronology – Fluorochemicals in Blood, Aug. 26, 1977, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1144.pdf.

133.    Studies by 3M in 1978 showed that PFOA reduced the survival rate of fathead minnow fish eggs,[16] that PFOS was toxic to monkeys,[17] and that PFOS and PFOA were toxic to rats.[18]  In the study involving monkeys and PFOS, all of the monkeys died within days of ingesting food contaminated with PFOS.

134.    In 1979, 3M and DuPont discussed 3M's discovery of PFOA in the blood of its workers and came to the same conclusion that there was "no reason" to notify the United States Environmental Protection Agency ("EPA") of the finding.[19]

iv. 1980s and 1990s: Evidence of AFFF's Health Risks Continues to Mount

135.    By the end of the 1980s, additional research and testing performed by Defendants, including DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

136.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.

---

[16] The Effects of Continuous Aqueous Exposure to 78.03 on Hatchability of Eggs and Growth and Survival of Fry of Fathead Minnow, June 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1176.pdf.

[17] Ninety-Day Subacute Rhesus Monkey Toxicity Study, Dec. 18, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1191.pdf; Aborted FC95 Monkey Study, Jan. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1193.pdf.

[18] Acute Oral Toxicity ($LD_{50}$) Study in Rats (FC-143), May 5, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1170.pdf; FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, Mar. 20, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.

[19] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.

23

137.    A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. Upon information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

v. Defendants Hid What They Knew from the Government and the Public.

138.    Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e)

139.    In December 2005, the EPA announced it was imposing the "Largest Environmental Administrative Penalty in Agency History" against DuPont based on evidence that it violated the TSCA by concealing the environmental and health effects of PFOA.

140.    Upon information and belief, Defendants knew or should have known that AFFF containing PFOA or PFOS would very likely injure and/or threaten public health and the environment, even when used as intended or directed.

141.    Defendants failed to warn of these risks to the environment and public health, including the impact of their AFFF/Component Products on the quality of unprotected water sources.

142.    Defendants were all sophisticated and knowledgeable in the art and science of designing, formulating, and manufacturing AFFF/Component Products. They understood far more about the properties of their AFFF/Component Products—including the potential hazards

24

they posed to human health and the environment—than any of their customers. Still, Defendants declined to use their sophistication and knowledge to design safer products.

## D. The Impact of PFOS and PFOA on the Environment and Human Health Is Finally Revealed

143.    Upon information and belief, Defendants failed to comply with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF/Component Products. *See* TSCA § 8(e).

144.    Once the truth about PFOS and PFOA was revealed, researchers began to study the environmental and health effects associated with them, including a "C8 Science Panel" formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

145.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

146.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birth weight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

147.    The injuries caused by PFAS can arise months or years after exposure.

148.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links"

25

with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

149.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

150.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

151.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[20]

152.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions,

---

[20] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 FR 26072 (May 2, 2012).

Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 32 of 136

limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[21]

153.    On May 25, 2016, the EPA released a lifetime health advisory (HAs) and health effects support documents for PFOS and PFOA.[22]    The EPA developed the HAs to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAs identify the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAs were based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFOS. These studies indicate that exposure to PFOS and PFOA over these levels may result in adverse health effects, including:

    a.    Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

    b.    Cancer (testicular and kidney);

    c.    Liver effects (tissue damage);

    d.    Immune effects (e.g., antibody production and immunity);

    e.    Thyroid disease and other effects (e.g., cholesterol changes).

---

[21] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[22] *See Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate*, 81 FR 33250 (May 25, 2016).

27

154.    In addition, PFOS and PFOA are hazardous materials because they pose a "present or potential threat to human health."[23]

155.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[24]

156.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of... PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is... credible."[25]

157.    California has listed PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[26]

---

[23] *Id.*; *see also National Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 3, 6 (D.C. Cir. 2015) (referring to PFOS as a "toxic compound" and a "hazardous chemical.").

[24] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf

[25] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

[26] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017, *available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause.

28

158.    On March 3, 2017, New York State added PFOA and PFOS to the list of hazardous substances at 6 NYCRR §597.3 and prohibited the use of AFFF containing PFOA or PFOS by April of 2017.

159.    On August 26, 2020, New York State imposed maximum contaminant levels ("MCLs") of 10 ppt for PFOS and PFOA for public drinking water supplies.[27]

160.    On March 14, 2023, the EPA announced proposed a National Primary Drinking Water Regulation for six PFAS including PFOA and PFOS.[28]  The proposed rule sets MCLs for public drinking water supplies of 4.0 parts per trillion ("ppt" or ng/L) for PFOA and PFOS, with a proposed Maximum Contaminant Level Goals of zero (0).

**E.  AFFF Containing PFOS and PFOA Is Fungible and Commingled in the Groundwater and Surface Water**

161.    AFFF containing PFOS and/or PFOA, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

162.    A subsurface or surface water plume, even if it comes from a single location, such as a retention pond or fire training area, normally originates from mixed batches of AFFF and chemical feedstock coming from different manufacturers.

163.    Because precise identification of the specific manufacturer of any given AFFF/Component Product that was a source of the PFAS found at the Airport or the Base, during fire protection, training, and response activities, resulting in widespread PFAS contamination is nearly impossible, given certain exceptions, Plaintiffs must pursue all Defendants, jointly and severally.

---

[27] 10 NYCRR Subpart 5-1.

[28] *PFAS National Primary Drinking Water Regulation Rulemaking,* 88 FR 18639 (March 29, 2023).

164.   Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/Component Products containing PFOS and PFOA, at Plaintiffs' expense, and to attempt to avoid liability.

## F. Contamination Caused by the Use of AFFF

### i. The City Property

165.   The City is located in Orange County, New York, on the Hudson River about 60 miles north of New York City.

166.   The City has been listed by the New York State Department of Environmental Conservation ("NYSDEC") as a potential Environmental Justice Area.

167.   The City is the owner of property ("Washington Lake Property") located at 660 Little Britain Road, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-1-12.2), which is approximately 254.96 acres, 660 Little Britain Road, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-1-10), which is approximately 52.9 acres, and Old Little Britain Road, in the Town of Newburgh, Orange County, New York (tax parcel identification no. 97-3-10), which is approximately 25.4 acres.

168.   The Washington Lake Property is located about three miles to the west of the City.

169.   The City pays real property taxes to the Town of New Windsor for the Washington Lake Property.

170.   The Washington Lake Property is the location of Washington Lake.

171.   Washington Lake is a State Class A waterbody pursuant to New York Environmental Conservation Law ("ECL") Article 15 (Water Index No. H-89-2-P225).

172.   Class A fresh surface waters are best used as "a source of water supply for drinking, culinary or food processing purposes; primary and secondary contact recreation; and fishing. The

30

waters shall be suitable for fish, shellfish, and wildlife propagation and survival." 6 N.Y.C.R.R. §701.6.

173.    Prior to on or about May 2, 2016, Washington Lake served as the primary water intake source for the City Water System (Water System ID NY3503503549), to supply drinking water to at least 28,000 residents and other water users.

174.    Washington Lake receives water from sources including the drainage basins of Silver Stream and its tributaries (Class A waterbodies), Patton Brook and its tributaries (Class A waterbodies), the New York State Route 300 storm sewer network, surface water runoff and groundwater recharge ("Washington Lake Source Water").

175.    In addition to Washington Lake Source Water, the City Watershed includes lands west of Washington Lake, including land through which the New York State Thruway (I-87), Route 207 and Route 300 pass, all of the Base Property, all of or a portion of the Airport Property, and Brown's Pond ("City Watershed").

176.    The City also owns the water treatment plant ("City Water Treatment Plant") at property ("Water Treatment Plant Property") located at 493 Little Britain Road, Newburgh, New York 12550 (tax parcel identification nos. 97-3-17 and 97-3-17.1) and Highway 207, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-1-35), together with all of the water treatment equipment located on that property, as well as the water distribution system consisting of piping, valves, hydrants, pump stations, raw water and finished water storage tanks.

177.    The City's water distribution system required the production of approximately 3 million gallons of water per day ("MGD").

178.    Diversion gates ("Silver Stream Diversion") from an impoundment near the junction of Routes 300 and 207 in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-3-1.1) ("Silver Stream Diversion Property") divert water from Silver Stream into the south side of Washington Lake.

179.    The City owns the Silver Stream Diversion Property.

180.    Tributaries feed Silver Stream upstream from the Silver Stream Diversion.

181.    Some of these tributaries and their sources originate on the Airport Property and/or the Base Property.

182.    The headwaters of one of Silver Stream's tributaries is a pond, referred to as Recreation Pond ("Rec Pond").

183.    Rec Pond is located on the southeast side of the Base Property and/or the Airport Property and receives surface water and sewer discharges from the Base and the Airport.

184.    In or about 1922, the uppermost reach of Silver Stream was impounded to create Brown's Pond (a/k/a Silver Stream Dam Reservoir), a reservoir located in Town of New Windsor, Orange County, New York (tax parcel identification no. 32-2-53) ("Brown's Pond Property").

185.    The City of Newburgh owns Brown's Pond (Water Index No. H-P 225-1-2 and P226a), and pays real property taxes to the Town of New Windsor for the Brown's Pond Property.

186.    Brown's Pond provides headwaters for Silver Stream.

187.    Brown's Pond is recharged naturally from groundwater and surface water flow, and does not receive water from Silver Stream.

188.    Patton Brook, lies west of Route 300 in the Town of Newburgh, and is diverted into Washington Lake through a channel called Murphy's Ditch (tax parcel identification no. 97-2-22.1) to the north side of Washington Lake.

32

189.    The City owns Murphy's Ditch.

190.    The City owns several additional pieces of property which facilitate its water service, including tax parcel identification nos. 4-1-9.21, 4-1-12.2 and 4-1-38 in the Town of New Windsor, Orange County, New York ("Additional Water Supply Parcels").

191.    The Washington Lake Property, Water Treatment Plant Property, Brown's Pond Property, Murphy's Ditch, Silver Stream Diversion Property, and Additional Water Supply Parcels are all portions of the "City Property," as used in this Complaint.

192.    The Catskill Aqueduct, which provides water to the City of New York and other local municipalities, passes to the north of Brown's Pond.

193.    In accordance with an agreement with NYCDEP, the City may withdraw Catskill Aqueduct water when needed at a significant cost.

194.    In order to provide water from the Catskill Aqueduct, NYCDEP made improvements to the City Water System connection to the Catskill Aqueduct west siphon and constructed the Brown's Pond blow-off structure on property identified as the Silver Stream (Brown's Pond) Station at 174 Mount Airy Road, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 32-2-52) ("Brown's Pond Station").

195.    The City has paid and is required to pay an annual permit fee ("Annual NYCDEP Permit Fee") to NYCDEP for these improvements to provide the City with clean water from the Catskill Aqueduct.

196.    As a result of the Contamination, the City expects that it will be required to purchase water from the NYCDEP in perpetuity, except to the extent it can safely utilize Brown's Pond, unless the sources of the Contamination and the Contamination in the City Watershed are fully remediated and all PFAS is removed.

33

197.    As a result, the City has sustained lost profits.

ii.  The Base

198.    Base operations are located on the Base Property, which is located at 1 Maguire Way, Newburgh, New York 12550, and is composed of portions of at least two parcels (tax parcel identification numbers 89-1-79 in the Town of Newburgh, Orange County, New York, and 3-1-63.2 in the Town of New Windsor, Orange County, New York).    The Base Property is approximately 2.5 miles west of Washington Lake.

199.    The Base Property is generally bounded by the Airport Property on the west, Route 17K to the north, Route 87 to the east, and primarily vacant land and land used for minor Base or Airport operations.

200.    The Base Property is located upgradient from Washington Lake.

201.    The Base Property is located in the City Watershed.

202.    The Airport Property includes property previously known as Stewart Air Force Base ("Stewart AFB").  For the purpose of this Complaint, references to the Airport Property shall include property formerly used as Stewart AFB.

203.    Upon information and belief, since the late 1960s and to the present date, at the Base Property, AFFF containing PFAS has been extensively used at crash sites, training areas, fuel tanker areas, Hangars 100-102, and fire station buildings, fire truck maintenance buildings, among other locations, without containment measures, and/or with inadequate or failing containment measures, leading to the foreseeable Disposals of PFAS into the surface water, groundwater, soil, and sediment at the Base Property and City Watershed, and the foreseeable Contamination of Washington Lake with PFAS.

34

204.    Upon information and belief, since the late 1960s, Discharges and Releases also likely occurred from inadequate and/or leaking storm and/or sanitary sewer systems, inadequate and/or leaking industrial waste systems, inadequate and/or leaking Lagoons, broken valves, leaking storage tanks, and during testing of fire suppression systems, false alarms, and maintenance, all without containment measures and/or with inadequate or failing containment measures, leading to the foreseeable release of Hazardous Substances, including PFAS, into the surface water, soil, groundwater, and sediment at the Base Property and City Watershed, and the foreseeable Contamination of Washington Lake with Pollutants, including PFAS.

iii.    The Airport

205.    Airport operations are located on the Airport Property, which is located at 1180 1st Street, New Windsor, New York 12553, and is composed of numerous parcels in the Town of Newburgh and Town of New Windsor, Orange County, New York.

206.    The Airport Property is approximately 2.5 miles west of the City.

207.    The Airport Property is located upgradient from Washington Lake.

208.    The Airport Property is partially located in the City Watershed.

209.    Upon information and belief, some or all of the Airport Property was previously operated as Stewart AFB, a military installation owned and/or operated by one or more of the Federal Defendants.

210.    Upon information and belief, since the late 1960s and to the present date, at the Airport Property, AFFF containing PFAS has been extensively used at crash sites, fuel tanker areas, training areas, fire suppression system testing areas, the Former Nozzle Testing Area, Building 142, and Building 2241, among other locations, without containment measures and/or with inadequate or failing containment measures, leading to the foreseeable release or disposal of

35

PFAS into the surface water, groundwater, and sediment at the Airport Property and the City Watershed, and the foreseeable Contamination of Washington Lake with PFAS.

211.    Upon information and belief, since the late 1960s, releases and disposals of PFAS likely occurred at the Airport Property from leaking storage tanks, inadequate and/or leaking storm sewer systems, inadequate and/or leaking industrial waste streams, broken valves, and during testing of fire suppression systems, false alarms and maintenance, without containment measures and/or with inadequate or failing containment measures, leading to the foreseeable disposal and release of PFAS into the surface water, groundwater, soil, and sediment at the Airport Property and City Watershed, and the foreseeable Contamination of Washington Lake with PFAS.

212.    Upon information and belief, AFFF containing PFAS is currently stored and used at the Airport on the Airport Property.

iv.  The Contamination

213.    In 2009, EPA issued the Provisional Health Advisories setting the Provisional Levels of 200 ppt for PFOS and 400 ppt for PFOA[29].

214.    In or about April 2014, the City began testing Washington Lake influent to the Water Treatment System for six PFAS—PFOS, PFOA, PFNA, PFHxS, PFHpA, and PFBS— pursuant to the EPA's Third UCMR.

215.    Upon information and belief, from December 2013 through March 2016, at least four samples were collected from Washington Lake influent which had detections of PFOS between 140 and 170 ppt and PFOA at 27 ppt. The PFOS and PFOA levels were below the EPA 2009 Provisional Health Advisory in place at the time.

---

[29] *Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, January 8, 2009; *available at* https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.

36

216.    Upon information and belief, from December 2013 through March 2016, at least four samples were collected from Washington Lake which had detections of PFNA of 5.7 ppt, PFHxA of 65 ppt, PFBS of 20.9 ppt, and PFHpA between 17 ppt and 21.6 ppt.  No provisional standards were in place at the time for these PFAS compounds.

217.    As a precautionary measure, on or about May 2, 2016, the City switched the City Water System supply from Washington Lake to Brown's Pond.

218.    At the time of the City's switchover, the 2009 EPA Provisional Levels were still in effect, and neither PFOS nor PFOA had been detected above the Provisional Levels in the City's water supply.

219.    After the City's switchover to Brown's Pond, on May 19, 2016, EPA announced that it had developed the new HAs for PFOA and PFOS, reducing the levels to a combined limit of 70 ppt.

220.    On or about June 7, 2016, due to decreased water levels in Brown's Pond, the City began providing its residents water blended water from Brown's Pond and the Catskill Aqueduct.

221.    By June 13, 2016, the City provided water only from the Catskill Aqueduct.  The Catskill Aqueduct water contained no measurable PFAS.

222.    Later sampling performed by NYSDEC in 2017 revealed trace amounts of PFAS in Brown's Pond below the levels set by the Health Advisories.

223.    As a result of the Contamination, the City expects that it will be required to purchase water from the NYCDEP in perpetuity, except to the extent it can use Brown's Pond during colder months when water levels are higher and the water is cleaner and free of algae, and when there are not unsafe levels of PFAS, unless the sources of the Contamination and the Contamination in the City Watershed and Washington Lake are eliminated and fully remediated.

37

224.    If the State stops providing funds to cover the cost to pay for clean Catskill Aqueduct water, the City will be required to increase water rates by approximately 45%.

225.    Such an increase is not affordable for City residents and other water users.

226.    Beginning in or about March of 2016, the NYSDEC began a limited investigation of the surface water, groundwater, and sediment in the City Watershed, including the Base Property, Airport Property, Silver Stream, Brown's Pond and Patton Brook, Washington Lake, and other water bodies that, upon information and belief, do not feed Washington Lake.

227.    NYSDEC first provided the City with lab results from that testing on or about May 9, 2016.

228.    Upon information and belief, NYSDEC's and NYANG's limited investigations identified PFAS contamination in the City Watershed and Washington Lake as follows:

Washington Lake

- March 2016 samples: PFOS identified in Washington Lake surface water at levels up to 243 ppt.
- September 30, 2016 and December 1, 2016 drawdown activities conducted between samples: PFOS was identified in Washington Lake surface water at levels up to 800 ppt. The other five PFAS compounds analyzed all had reported values above their respective reporting limits ranging from 11.1 ppt (PFBS) to 73 ppt (PFHxS).
- August 2017 samples: PFOS identified in Washington Lake surface water at levels up to 170 ppt. Eleven other PFAS, including PFOA (30 ppt), PFHxS (69 ppt), and PFNA (20 ppt), were detected ranging from 2.4 ppt to 69 ppt. Low levels of PFAS were also identified in the sediment at the bottom of Washington Lake.

Silver Stream

- March through May 2016 samples: PFOS identified in Silver Stream surface water at levels up to 290 ppt.
- October 2017 samples: PFOS measured in the Rec Pond tributary surface water to Silver Stream at levels up to 11,800 ppt. PFOS measured in surface water in the Silver Stream diversion into Washington Lake at levels up to 181 ppt and total PFAS[30] of 433 ppt.
- October and November 2017 samples: PFOS measured in Silver Stream surface

---

[30] Upon information and belief "Total PFAS" include any and all PFAS that were sampled for, and may include up to 21 compounds, but not all PFAS that have been manufactured or used by Defendants.

water at levels up to 281 ppt.

Patton Brook

- May 2016 samples: PFOS identified in Patton Brook surface water at levels up to 11.3 ppt.

Base Property

- March 2016 and May 2016 samples: PFOS measured in the surface waters at Base Outfalls A, 002, 003, 017K, and 010 located at Rec Pond at a range of 60 ppt to 5,900 ppt.
- June 2016 samples: PFOS identified in the groundwater at sampling locations surrounding the apron on the Base Property at 21 ppt, 190 ppt, and 3,160 ppt.
- June 2016 and September 2016 samples: PFOS identified in the catch basin water at sample locations surrounding the apron on the Base Property ranging from 14 ppt to 6,990 ppt.
- August 2016 samples: PFOS identified in the surface soil at sample locations surrounding the apron on the Base Property at 320 ppt, 470 ppt, and 5,620 ppt.
- September 2016 samples: PFOS, PFOA, and other PFAS identified in nine surface water samples on the Base Property. PFOS was identified at a range of 17 ppt to 3610 ppt; PFOA was identified at a range of 13 ppt to 520 ppt; total PFAS ranged from 74 ppt to 5,843 ppt.
- September 2016 samples: The total PFAS identified in groundwater on the Base Property at MW-3 measured at 368 ppt.
- March 2017 samples: PFOS identified in the surface waters of the floor drains at the Base Property at the Firehouse at concentrations up to 480,000 ppt.
- October 2017 samples: PFOS identified in the Retention Basin surface water at 2,520 ppt.
- October and November 2017 samples: PFOS measured in the surface water at Base Outfalls 002, 003 and 010 located at Rec Pond at range of 607 to 1,710 ppt. PFOS identified in groundwater on the Base Property at the following Potential Release Locations ("PRL"): PRL-1 at 137 ppt; PRL-2 at 174 ppt; PRL-3 at 714 ppt; PRL-15 at 4,920 ppt; and the former base landfill at 262 ppt. PFOS identified in the surface soils at various locations throughout the Base at concentrations up to 520,000 ppt. The Total PFAS identified in groundwater on the Base property ranged from 7 ppt to 11,562 ppt. The Total PFAS identified in groundwater downgradient of the Base ranged from 34 ppt to 3,344 ppt.

Airport Property

- June 2016 samples: Combined measure of PFOS and PFOA in soil on the runway near Airport Outfall 003 at a range of 6,680 ppt to 1,845,680 ppt, and total PFAS ranging from 7,400 ppt to 1,897,580 ppt. Combined measure of PFOS and PFOA in soil just north and northeast of Building 142 at a range of 6,370 ppt to 596,670 ppt, and total PFAS ranging from 7,730 ppt to 619,140 ppt.
- July 2016 samples: Combined measure of PFOS and PFOA in the surface waters

39

at Airport Outfalls 003, 005, 008, 010, 011, and 013 at a range of 19 ppt to 306 ppt, and total PFAS ranging from 14 ppt to 462 ppt.

- July 2016 samples: PFOS in groundwater north of the runway ranging from 120 ppt to 340 ppt.

Downgradient of Base Property

- May 2018 samples: PFOS and Total PFAS (limited to six (6) UCMR-3 PFAS compounds) measured in surface water in the tributary downstream of Recreation Pond were 439 ppt and 682 ppt, respectively. PFOS and Total PFAS measured in surface water in Silver Stream were 176 ppt and 259 ppt, respectively. PFOS and Total PFAS measured in surface water in the Silver Stream Diversion to Lake Washington were 108 ppt and 209 ppt, respectively.
- May 2018 samples: PFOS and Total PFAS in groundwater at monitoring wells distal to the Base and along Route 209 were 18 ppt and 133 ppt, respectively.
- April 2019 samples: PFOS and Total PFAS (limited to six (6) UCMR-3 PFAS compounds) measured in surface water entering and in Recreation Pond at 490 ppt and 717 ppt, respectively.

229.    Upon information and belief, in 2017 trace levels of PFAS were identified in Brown's Pond below the HAs.

230.    Environmental investigations of the Base Property are in progress, but remedial action has not commenced, and discharges have not ceased.

231.    This work has resulted in a study released on October 31, 2018, entitled "Phase I Regional Site Inspections Per- And Polyfluoroalkyl Substances," along with an Addendum released on March 1, 2019.

232.    That study documented multiple areas of PFAS Contamination in soil, sediments, surface water and groundwater on and downstream from the Base Property, including Rec Pond.

233.    Since 2016, the City has repeatedly requested that interim remedial measures ("IRMs") be implemented to remediate the Contamination and halt the discharge of contaminants from Rec Pond to Silver Stream.

40

234.    While in 2021, an IRM was installed to treat the discharge of contaminants from Rec Pond, that system has only been partially successful, and often is bypassed in heavy rainfall events.

## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, AND ENTERPRISE LIABILITY

235.    Defendants in this action are manufacturers that control a substantial share of the market for AFFF/Component Products containing PFAS and/or their chemical precursors in the United States and are jointly responsible for the contamination of the groundwater and surface water in the City Watershed, including on the City Property.  Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF/Component Products at issue in this Complaint.

236.    Because PFAS is fungible, upon information and belief it is impossible to identify the exact Defendant who manufactured any given AFFF/Component Product containing PFAS, and/or their chemical precursors found free in the air, soil or groundwater, and each of these Defendants participated in a territory-wide and U.S. national market for AFFF/Component Products during the relevant time.

237.    Because precise identification of the specific manufacturer of any given AFFF/Component Product that was a source of the PFAS found in the City Watershed and the City Water System and on the City Property is nearly impossible, given certain exceptions, Plaintiff must pursue all Defendants, jointly and severally.

238.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/Component Products containing PFOS and PFOA, at Plaintiff's expense, and to attempt to avoid liability.

41

239.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

240.    Enterprise and/or market share liability attaches to all the named Defendants for casting defective products into the stream of commerce.

### FIRST CAUSE OF ACTION
### FOR DEFECTIVE DESIGN

241.    Plaintiff repeats and realleges paragraphs 1 through 240 of this Complaint, as if set forth in this paragraph at length.

242.    As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiff, and not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

243.    Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

      a.  PFAS causes extensive surface water, groundwater, soil and sediment contamination, even when used in its foreseeable and intended manner;

      b.  Even at extremely low levels, PFAS render drinking water unfit for consumption;

      c.  PFAS poses significant threats to public health; and

      d.  PFAS create real and potential environmental damage.

244.    Defendants knew of these risks and failed to use reasonable care in the design of their AFFF/Component Products.

245. AFFF containing PFOS, PFOA, and/or their chemical precursors poses a greater danger to the environment and to human health than would be expected by ordinary persons such as Plaintiff and the general public.

246. At all times, Defendants were capable of making AFFF/Component Products that did not contain PFOS, PFOA, and/or their chemical precursors. Thus, reasonable alternative designs existed which were capable of preventing Plaintiff's injuries.

247. The risks posed by AFFF containing PFOS, PFOA, and/or their chemical precursors far outweigh the products' utility as a flame-control product.

248. The likelihood that Defendants' AFFF/Component Products would be spilled, discharged, disposed of, or released into the environment and the contamination of its drinking water, which has tested positive for PFAS, far outweighed any burden on Defendants to adopt an alternative design, and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

249. As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, the City Watershed, the City Water System and the City Property have become contaminated.

250. Defendants knew that it was substantially certain that their acts and omissions described above would contaminate the City Watershed, the City Water System and the City Property.

251. Defendants are therefore strictly, jointly and severally liable for all of the damages to the City proximately caused by such wrongful acts and omissions, including damages to the

43

City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

252. Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

253. Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the damages to Plaintiff, disregarding their protected rights, such that the imposition of punitive damages is warranted.

254. Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS would not be released into the environment and inevitably contaminate the City Watershed, the City Water System and the City Property.

## SECOND CAUSE OF ACTION
## FOR FAILURE TO WARN

255. Plaintiff repeats and realleges paragraphs 1 through 254 of this Complaint, as if set forth in this paragraph at length.

256. As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants had a duty to provide adequate warnings of the risks of these products to all persons whom its product might foreseeably harm, including Plaintiff.

257. Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

a. PFAS causes extensive surface water, groundwater, soil and sediment contamination, even when used in its foreseeable and intended manner;

44

    b.  Even at extremely low levels, PFAS render drinking water unfit for consumption;

    c.  PFAS poses significant threats to public health; and

    d.  PFAS create real and potential environmental damage.

258.   Defendants knew of the health and environmental risks associated with their AFFF/Component Products and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with their products or an instruction that would have avoided Plaintiff's injuries.

259.   Despite Defendants' knowledge of the environmental and human health hazards associated with the use and/or disposal of their AFFF/Component Products in the vicinity of drinking water supplies, including PFAS contamination of the drinking supplies, Defendants failed to issue any warnings, instructions, recalls, or advice regarding their AFFF/Component Products to Plaintiff, other governmental agencies or the public.

260.   As a direct and proximate result of Defendants' failure to warn, Plaintiffs' water supply has been, and continues to be, contaminated with PFAS in varying amounts over time, causing Plaintiffs significant injuries and damages. Further, this contamination led to the exposure of Plaintiffs to toxins and increased their probabilities of numerous diseases as more fully set forth above.

261.   Defendants knew that it was substantially certain that their acts and omissions described above would contaminate Plaintiffs water supply with PFAS in varying amounts, causing Plaintiffs significant injuries and damages.

262.   Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiff's customers' health and safety, and/or Plaintiff's property rights.

45

263.    Defendants are therefore strictly, jointly and severally liable for all of the damages to the City proximately caused by such wrongful acts and omissions, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

264.    Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

### THIRD CAUSE OF ACTION
### FOR NEGLIGENCE

265.    Plaintiff repeats and realleges paragraphs 1 through 264 of this Complaint, as if set forth in this paragraph at length.

266.    As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to Plaintiff and to all persons whom its products might foreseeably harm and to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PFAS-containing AFFF.

267.    Defendants owed a duty to Plaintiff to act reasonably and not place inherently dangerous AFFF/Component Products into the marketplace when its release into the air, soil, and water was imminent and certain.

268.    Defendants knew or should have known that PFAS were leaching from AFFF used for fire protection, training, and response activities.

269.    Defendants knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate water supplies if released into the environment.

46

270.    Defendants knew or should have known that the manner in which they were designing, manufacturing, marketing, distributing, and selling their AFFF/Component Products would result in contamination of the City Watershed, the City Water System and the City Property.

271.    Despite the fact that Defendants knew or should have known that PFAS are toxic, can contaminate water resources and are carcinogenic, Defendants negligently:

    a.    designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors;

    b.    issued deficient instructions on how their AFFF/Component Products should be used and disposed of, thereby permitting PFAS to contaminate the surface waters and groundwater in and around the City;

    c.    failed to recall and/or warn the users of their AFFF/Component Products of the dangers of groundwater contamination as a result of standard use and disposal of their products;

    d.    failed and refused to issue the appropriate warning and/or recalls to the users of their AFFF/Component Products; and

    e.    failed to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

272.    The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiff was minimal, as the practical consequences of placing this burden on the Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products.

47

273.    As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products, and to take steps to eliminate, correct, or remedy any contamination they caused.

274.    Under the Clean Water Act and ECL Article 17, discharge of PFAS into the waters of the State of New York, including groundwater, or waters of the United States, is prohibited unless specifically permitted, but there was no permit to discharge PFAS into the City Watershed or Washington Lake.

275.    Discharges of "polluted liquid," including PFAS, into the City Watershed and Washington Lake is prohibited by the regulations of the New York State Department of Health. 10 N.Y.C.R.R. §133.2(e) and (f).

276.    Pursuant to ECL §37-0107, "no person shall store or release to the environment substances hazardous or acutely hazardous to public health, safety or the environment in contravention of rules and regulations promulgated pursuant hereto," but the PFAS continues to be discharged into the City Watershed in contravention of that statutory prohibition.

277.    As a direct and proximate result of Defendants' negligence, Plaintiff's property has been contaminated with PFAS, in violation of the above prohibitions.

278.    Defendants knew that it was substantially certain that their acts and omissions described above would contaminate the City Watershed, the City Water System and the City Property.

279.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of City Water Users, and the City's property rights, proximately resulting in damages to the City.

48

280.    Defendants are therefore jointly and severally liable for all of the damages to the City proximately caused by such negligence, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

281.    Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

### FOURTH CAUSE OF ACTION
### FOR TRESPASS

282.    Plaintiff repeats and realleges paragraphs 1 through 281 of this Complaint, as if set forth in this paragraph at length.

283.    Plaintiff is the owner, operator, and actual possessor of the City Property, real property and improvements used for collecting, treating and disseminating drinking water.

284.    Defendants designed, manufactured, distributed, marketed, and sold AFFF/Component Products with the actual knowledge and/or substantial certainty that AFFF containing PFOS, PFOA, and/or their chemical precursors would, through normal use, release PFAS that would migrate into surface waters and groundwater, causing contamination.

285.    Defendants intentionally designed, manufactured, distributed, marketed, and sold AFFF/Component Products in a manner that caused PFAS to contaminate Plaintiff's property.

286.    Defendants knew or should have known that PFAS would migrate to or otherwise enter the nearby groundwater, the City Watershed, Washington Lake, and the City Water System.

287.    The Contamination was the inevitable result of those intentional acts and omissions.

288.    Defendants failed to prevent, remediate, or otherwise stop the Contamination.

49

289. Defendants, by their acts and omissions, or the acts or omissions of their agents, employees or predecessors, have interfered with the rights of the City to exclusive possession of Washington Lake and the City Property, and threaten to do so in the future.

290. As a direct and proximate result of Defendants' trespass, Plaintiff has suffered and continues to suffer property damage requiring investigation, remediation, and monitoring costs.

291. Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of property, including surface waters and groundwater collected for drinking.

292. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of City Water Users and the Plaintiff's property rights, proximately causing damages to the City.

293. Defendants are therefore jointly and severally liable for all of the damages to the City proximately caused by such trespass, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

294. Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

## FIFTH CAUSE OF ACTION AGAINST THE DUPONT ENTITIES FOR VIOLATION OF THE UNIFORM FRAUDULENT CONVEYANCE ACT

295. Plaintiff repeats and realleges the allegations of paragraphs 1 through 294 of this Complaint as if set forth in this paragraph at length.

50

Case 7:23-cv-07370-KMK   Document 1-1   Filed 08/18/23   Page 56 of 136

296.     Plaintiff seeks equitable and other relief pursuant to the Uniform Fraudulent Conveyance Act (UFCA) as adopted by the State of New York at NY Debtor and Creditor Law ("Dr. & Cr. Law") Article 10, against the DuPont Entities (DuPont, Chemours, Chemours FC, Corteva, and DuPont de Nemours, Inc.).

297.     The UFCA provides a "conveyance made" or "obligation incurred" is "fraudulent as to creditors as to both present and future creditors," and "without regard to his actual intent," when: (a) "the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital," Dr. & Cr. Law §274; (b) "the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature," Dr. & Cr. Law §275; or (c) made or incurred "with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors," Dr. & Cr. Law §276.

298.     The DuPont Entities: (a) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; (b) intended to incur, or believed or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due; and (c) acted with actual intent to hinder, delay and defraud Plaintiff and other potential creditors.

299.     The DuPont Entities engaged in acts in furtherance of a scheme to transfer the assets of DuPont out of the reach of parties such as Plaintiff that have been damaged as a result of the DuPont Entities' conduct, omissions, and actions described in this Complaint.

300.     It is primarily DuPont, rather than Chemours, that for decades manufactured, marketed, distributed and/or sold AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors with the superior knowledge that they were toxic, mobile, persistent,

51

bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate drinking water supplies.

301.   As a result of the transfer of assets and liabilities described in this Complaint, the DuPont Entities have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

302.   At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

303.   The DuPont Entities acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

304.   At all times relevant to this action, the claims, judgment and potential judgments against Chemours have potentially exceeded its ability to pay.

305.   Pursuant to Dr. & Cr. Law Article 10, Plaintiff seeks avoidance of the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold the DuPont Entities liable for any damages or other remedies that may be awarded by the Court or jury to Plaintiff in this action.

306.   Plaintiff further seeks all other rights and remedies that may be available to it under UFCA, including prejudgment remedies as available under applicable law, as may be necessary to

52

fully compensate Plaintiff for the damages and injuries it has proximately suffered as alleged in this Complaint.

## SIXTH CAUSE OF ACTION
## FOR PUBLIC NUISANCE

307. Plaintiff repeats and realleges the allegations of paragraphs 1 though 306 of this Complaint, as if set forth in this paragraph at length.

308. Plaintiff is the owner of land, easements, and water rights that permit it to extract surface and groundwater to provide water to the City Water System and City Water Users.

309. Defendants' intentional, negligent, and/or reckless conduct, as alleged herein, has resulted in contamination of the City Watershed, the City Water System and the City Property with PFAS, human carcinogens that cause adverse human health effects.

310. Defendants' manufacture, distribution, sale, supply, and marketing of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors, was unreasonable because Defendants had knowledge of the unique and dangerous chemical properties of PFAS and knew that contamination of surface waters and groundwater supply wells was substantially certain to occur, but failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

311. The Contamination caused, contributed to, and/or maintained by Defendants substantially and unreasonably interfered with, and continues to interfere with Plaintiff's use and enjoyment of its property.

312. Each Defendant has caused, contributed to, and/or maintained such nuisance, and is a substantial contributor to such nuisance.

313. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has suffered, is suffering, and will continue to suffer substantial damages related

53

to PFAS contamination of the Impacted Systems, including but not limited to devaluation, capital costs, legal costs, and sampling costs.

314.     Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of the City Watershed, City Water System and the City Property.

315.     Defendants (including their officers, agents, servants, and/or employees), by causing the Contamination, have interfered and continue to interfere with the rights common to all, including groundwater, surface waters including the City Watershed and Washington Lake, the City Water System, and public lands, and have caused an imminent and substantial endangerment to health and the environment.

316.     The City, as a property owner of the City Property and operator of the City Water System, has sustained special damages from this public nuisance.

317.     The Contamination interferes with the public's and the City's use and/or enjoyment of City Property, and the water in the City Watershed and Washington Lake, in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

318.     Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on surface water and groundwater resources, public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

319.     Defendants are therefore jointly and severally liable for all of the damages to the City proximately caused by such public nuisance, including damages to the City Watershed and

Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

320.    Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

## SEVENTH CAUSE OF ACTION FOR EQUITABLE
### AND/OR IMPLIED INDEMNIFICATION

321.    The City repeats and realleges paragraphs 1 through 320 of this Complaint, as if set forth in this paragraph at length.

322.    Defendants, including their officers, agents, servants, employees, and/or lessees, had a non-delegable duty to the City and the public to prevent, clean up, or ensure against the Contamination and to prevent the release and discharge of PFAS into the City Watershed.

323.    As a result of the breach of this duty by Defendants, including their officers, agents, servants, employees, and/or lessees, the defendants are responsible for the City's expenses and damages in investigation, remediation, cleanup, and removal of, and response to the Contamination, and as a result, the Defendants should, in equity, indemnify the City for its expenses, costs, and damages.

## EIGHTH CAUSE OF ACTION
### FOR RESTITUTION

324.    The City repeats and realleges paragraphs 1 through 323 of this Complaint, as if set forth in this paragraph at length.

325.    It would be against equity and good conscience to permit the Defendants to pass the burden of cleaning up the Contamination to the City, and to have had the benefit of enjoyment

of profits from the manufacture and sale of AFFF, free of any responsibility for investigation, remediation, cleanup, and removal of, and response to, the Contamination.

326.    Therefore, Defendants should make restitution to the City for all of its expenses, costs, and damages, including attorneys' fees and costs incurred in defending itself from the City Water User Claims.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff City demands Judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

(1)    Granting Permanent Injunctions to abate the public nuisance and imminent and substantial endangerment to health and the environment as follows:

(a)    Directing Defendants to immediately install effective IRMs to prevent PFAS and other Contamination from entering the City Watershed, Washington Lake and the City Water Supply, including surface water, groundwater, and sediments;

(b)    Directing that all IRMs treat for all PFAS to Method Detection Limits;

(c)    Directing Defendants to fully investigate (including a hydrology study), identify sources of, remove and remediate the Contamination of the groundwater, surface water, soil and sediments of the Facilities, Washington Lake, Silver Stream, and other related water bodies in the City Watershed;

(d)    Directing Defendants to pay for costs incurred by the City to continue to receive clean water from the Catskill Aqueduct and Brown's Pond until all abatement, removal and remediation is complete, and providing safe, contaminant and/or pollutant free water transported from an acceptable source to the City Water Treatment Plant for filtration during any shutdown of the Catskill Aqueduct by NYCDEP;

56

(e)      Directing Defendants to pay for the City's independent consultants to perform independent analysis of all IRMs and remedial measures;

(f)      Directing Defendants to pay for all necessary investigation and remedial costs; and

(2)      Awarding the City compensatory damages and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;

(3)      Declaring that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the property rights of the City and the health and safety of City Water users;

(4)      Barring the transfer of DuPont's liabilities for the claims brought in this Complaint;

(5)      Directing that Defendants defend and indemnify the City in the City Water User Claims, and compensate it for its costs and attorneys' fees.

(6)      Awarding the City attorneys' fees and costs;

(7)      Awarding punitive damages in an amount to be determined at trial;

(8)      Awarding Pre-judgment and post-judgment interest;

(9)      Granting such further relief as the Court deems just and proper.

Dated: July 8, 2023

Respectfully submitted,

**KNAUF SHAW LLP**

By: /s/ Amy K. Kendall
Alan J. Knauf, Esq.,
Amy K. Kendall, Esq., and
Melissa M. Valle, Esq. of Counsel
2600 Innovation Square
100 South Clinton Avenue
Rochester, New York 14604
(585) 546-8430

57

**BRANDYWINE PROCESS SERVERS, LTD.**
PO BOX 1360
Wilmington, DE 19899
302-475-2600
brandywineps@comcast.net
www.wilmingtonprocessserver.com

# INVOICE

**BILL TO**
KNAUF SHAW LLP
2600 Innovation Sq
100 S. Clinton Ave
ROCHESTER, NY 14604

**INVOICE #** 10665
**DATE** 07/19/2023
**DUE DATE** 08/18/2023
**TERMS** Net 30

| DATE | CASE CAPTION | AMOUNT |
|------|-------------|--------|
| 07/19/2023 | CITY OF NEWBURGH    V    AGC INC | |
| | AGC CHEMICALS AMERICAS INC | 89.00 |
| | ARCHROMA U.S. INC | 59.00 |
| | BASF CORPORATION | 59.00 |
| | CARRIER GLOBAL CORPORATION | 59.00 |
| | CHEMDESIGN PRODUCTS INC | 89.00 |
| | CORTEVA, INC. | 59.00 |
| | DEEPWATER CHEMICALS, INC | 59.00 |
| | DUPONT DE NEMOURS INC | 59.00 |
| | DYNAX CORPORATION | 89.00 |
| | E. I. DUPONT DE NEMOURS AND COMPANY | 59.00 |
| | THE CHEMOURS COMPANY | 59.00 |
| | THE CHEMOURS COMPANY FC, LLC | 59.00 |
| | COPY CHARGES | 142.00 |

| | BALANCE DUE | **$940.00** |
|--|-------------|-------------|

TAX ID # 51-0267938

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

*Index No.*  EF004436-2023

|  |  |
|---|---|
| CITY OF NEWBURGH | *Plaintiff(s) Petitioner(s)* |

against

AGC, INC., F/K/A ASASHI GLASS CO., ET AL.

*Defendant)s) Respondent(s)*

07/08/2023
Calendar No.

*l ~ AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE                    Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at **Wilmington, DE**

On  07/19/2023                    at     11:45 A .M., at   C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801

deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation          ☒ NOTICE OF ELECTRONIC FILING;

on
AGC CHEMICALS AMERICAS, INC.

☒ defendant      ☐ witness        hereinafter called       therein
☐ respondent                      the recipient           lamed

**INDIVIDUAL**
1. ☐

by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION**
2. ☒

a   DELAWARE            corporation, by delivering thereat a true *copy of each* to   ROBIN HUTT-BANKS
personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be  MANAGING AGENT                                    thereof

**SUITABLE AGE PERSON**
3. ☐

by delivering thereat a true copy *of each* to                                a person of suitable age and discretion. Said premises is recipient's ☐  actual place of business ☐  dwelling place ☐  usual place of abode within the state.

**AFFIXING TO DOOR, ETC.**
4. ☐

by affixing a true copy of *each* to the door of said premises, which is recipient's ☐  actual place of business ☐  dwelling place ☐  usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4**
5A. ☐

Deponent talked to                              at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at                                  and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4**
5B. ☐

Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at                                  in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION**
☒

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3' | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8' | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0' | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☐ Over 200 Lbs. |

☐

Other identifying features:

**WITNESS FEES**
☐

$                  the authorizing traveling expenses      ☐  was paid (tendered) to the recipient
and one days' witness fee:              ☐  was mailed to the witness with subpeona copy.

**MILITARY SERVICE**
☐

I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on   07/19/2023

License No.

DENORRIS ANGEL G BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on May 1, 2024

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO BOX 1360, WILMINGTON, DE 19899

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE  *Index No.*  EF004436-2023

| | 07/08/2023 |
| --- | --- |
| | Calendar No. |

CITY OF NEWBURGH

*Plaintiff(s) Petitioner(s)*

against

AGC, INC., F/K/A ASASHI GLASS CO., ET AL.

*Defendant)s) Respondent(s)*

~ *AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE          Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at  **Wilmington, DE**

On  07/19/2023          at   11:45 A .M., at   C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801
deponent served the within

- ☒ summons and complaint
- ☐ subpoena duces tecum
- ☐ citation  ☒ NOTICE OF ELECTRONIC FILING;

on          ☒ defendant   ☐ witness      hereinafter called      therein
ARCHROMA U.S., INC.          ☐ respondent          the recipient      lamed

**INDIVIDUAL**
1. ☐          by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION**
2. ☒          a   DELAWARE          corporation, by delivering thereat a true *copy of each* to   ROBIN HUTT-BANKS
personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be  MANAGING AGENT          thereof

**SUITABLE AGE PERSON**
3. ☐          by delivering thereat a true copy *of each* to          a person of suitable age and discretion. Said premises is recipient's ☐  actual place of business ☐  dwelling place ☐  usual place of abode within the state.

**AFFIXING TO DOOR, ETC.**
4. ☐          by affixing a true copy of *each* to the door of said premises, which is recipient's ☐  actual place of business ☐  dwelling place ☐  usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4**
5A. ☐          Deponent talked to          at said premises who stated that recipient ☐  lived ☐  worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at          and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4**
5B. ☐          Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at
in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION**
☒

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| ☐ Male | ☐ White Skin | ☒ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☐ Over 200 Lbs. |

☐          Other identifying features:

**WITNESS FEES**
☐          $          the authorizing traveling expenses     ☐ was paid (tendered) to the recipient
and one days' witness fee:     ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE**
☐          I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on  07/19/2023          License No.

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on May 1, 2024

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO
BOX 1360, WILMINGTON, DE 19899

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

Index No. EF004436-2023

| | |
|---|---|
| CITY OF NEWBURGH | Plaintiff(s) Petitioner(s) |
| against | |
| AGC, INC., F/K/A ASASHI GLASS CO., ET AL. | Defendant)s) Respondent(s) |

07/08/2023
Calendar No.

1~ AFFIDAVIT OF SERVICE

STATE OF DELAWARE, COUNTY OF: NEW CASTLE    Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at **Wilmington, DE**

On 07/19/2023 at 11:45 A .M., at C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801 deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation ☒ NOTICE OF ELECTRONIC FILING;

on    ☒ defendant    ☐ witness    hereinafter called    therein
BASF CORPORATION    ☐ respondent    the recipient    lamed

**INDIVIDUAL 1. ☐** by delivering a true copy of each to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION 2. ☒** a    DELAWARE    corporation, by delivering thereat a true copy of each to    ROBIN HUTT-BANKS personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be    MANAGING AGENT    thereof

**SUITABLE AGE PERSON 3. ☐** by delivering thereat a true copy of each to    a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC. 4. ☐** by affixing a true copy of each to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A. ☐** Deponent talked to    at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at    and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B. ☐** Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at    in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION ☒**

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☐ Over 200 Lbs. |

☐ Other identifying features:

**WITNESS FEES ☐** $    the authorizing traveling expenses ☐ was paid (tendered) to the recipient
and one days' witness fee: ☐ was mailed to the witness with subpoena copy.

**MILITARY SERVICE** I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient wore ordinary civilian clothes and no military uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on    07/19/2023

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2024

License No.

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO BOX 1360, WILMINGTON, DE 19899

· 4 of 13

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

Index No. EF004436-2023

| | | |
|---|---|---|
| CITY OF NEWBURGH | *Plaintiff(s) Petitioner(s)* | 07/08/2023 |
| | | Calendar No. |
| against | | |
| AGC, INC., F/K/A ASASHI GLASS CO., ET AL. | | *~ AFFIDAVIT OF SERVICE* |
| | *Defendant)s) Respondent(s)* | |

STATE OF DELAWARE, COUNTY OF: NEW CASTLE Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at **Wilmington, DE**

On 07/19/2023 at 11:45 A .M., at C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801 deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation ☒ NOTICE OF ELECTRONIC FILING;

on ☒ defendant ☐ witness hereinafter called therein
CARRIER GLOBAL CORPORATION ☐ respondent the recipient lamed

**INDIVIDUAL 1.☐** by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION 2.☒** a DELAWARE corporation, by delivering thereat a true *copy of each* to ROBIN HUTT-BANKS personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be MANAGING AGENT thereof

**SUITABLE AGE PERSON 3.☐** by delivering thereat a true copy *of each* to a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC. 4.☐** by affixing a true copy of *each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.☐** Deponent talked to at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.☐** Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION ☒**

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☐ Over 200 Lbs. |

☐ Other identifying features:

**WITNESS FEES ☐** $ the authorizing traveling expenses ☐ was paid (tendered) to the recipient
and one days' witness fee: ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE ☐** I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on 07/19/2023

License No.

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on May 1, 2024

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO
BOX 1360, WILMINGTON, DE 19899

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

*Index No.* EF004436-2023

|  |  |
|---|---|
| CITY OF NEWBURGH | *Plaintiff(s) Petitioner(s)* |
| against | |
| AGC, INC., F/K/A ASASHI GLASS CO., ET AL. | *Defendant)s) Respondent(s)* |

07/08/2023
Calendar No.

~ *AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE                              Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at **Wilmington, DE**

On 07/19/2023                    at    11:45 A.M., at    C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801
deponent served the within
- ☒ summons and complaint
- ☐ subpoena duces tecum
- ☐ citation
- ☒ NOTICE OF ELECTRONIC FILING;

on    CORTEVA, INC.

- ☒ defendant    ☐ witness    hereinafter called    therein
- ☐ respondent            the recipient    lamed

**INDIVIDUAL 1.** ☐  by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION 2.** ☒  a    DELAWARE    corporation, by delivering thereat a true *copy of each* to    ROBIN HUTT-BANKS
personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be    MANAGING AGENT    thereof

**SUITABLE AGE PERSON 3.** ☐  by delivering thereat a true copy *of each* to    a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC. 4.** ☐  by affixing a true copy of *each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.** ☐  Deponent talked to                at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at                and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.** ☐  Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at
in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION** ☒

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☒ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☐ Over 200 Lbs. |

☐  Other identifying features:

**WITNESS FEES** ☐    $            the authorizing traveling expenses    ☐ was paid (tendered) to the recipient
and one days' witness fee:    ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE** ☐  I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on    07/19/2023                              License No.

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO BOX 1360, WILMINGTON, DE 19899

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

*Index No.* EF004436-2023

CITY OF NEWBURGH

*Plaintiff(s) Petitioner(s)*

against

AGC, INC., F/K/A ASASHI GLASS CO., ET AL.

*Defendant(s) Respondent(s)*

07/08/2023
Calendar No.

*~ AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE                    Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at **Wilmington, DE**

On **07/19/2023**            at       **11:45** A .M., at   C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801
deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation           ☒ NOTICE OF ELECTRONIC FILING;

on                                                            ☒ defendant    ☐ witness    hereinafter called    therein
DEEPWATER CHEMICALS, INC.                                    ☐ respondent          the recipient     lamed

**INDIVIDUAL 1.** ☐   by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION 2.** ☒   a   **DELAWARE**          corporation, by delivering thereat a true *copy of each* to   **ROBIN HUTT-BANKS**
personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be **MANAGING AGENT**                      thereof

**SUITABLE AGE PERSON 3.** ☐   by delivering thereat a true copy *of each* to                                    a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC. 4.** ☐   by affixing a true copy of *each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.** ☐   Deponent talked to                        at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at                                        and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.** ☐   Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at
in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION ☒**

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☒ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☐ Over 200 Lbs. |

☐   Other identifying features:

**WITNESS FEES** ☐   $            the authorizing traveling expenses     ☐ was paid (tendered) to the recipient
and one days' witness fee:    ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE** ☐   I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on   07/19/2023

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on May 1, 2024

License No.

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO
BOX 1360, WILMINGTON, DE 19899

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

*Index No.* EF004436-2023

| | | 07/08/2023 |
|---|---|---|
| | | Calendar No. |

CITY OF NEWBURGH

*Plaintiff(s) Petitioner(s)*

against

AGC, INC., F/K/A ASAHSI GLASS CO., ET AL.

*Defendant)s) Respondent(s)*

*I~ AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE                    Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at **Wilmington, DE**

On 07/19/2023          at      11:45 A .M., at  C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801
deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation     ☒ NOTICE OF ELECTRONIC FILING;

on                                        ☒ defendant     ☐ witness     hereinafter called     therein
DUPONT DE NEMOURS, INC.          ☐ respondent          the recipient     lam ed

**INDIVIDUAL 1.☐** by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION 2.☒** a  DELAWARE          corporation, by delivering thereat a true *copy of each* to    ROBIN HUTT-BANKS
personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be  MANAGING AGENT                          thereof

**SUITABLE AGE PERSON 3.☐** by delivering thereat a true copy *of each* to                                        a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC. 4.☐** by affixing a true copy of *each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.☐** Deponent talked to                          at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at                          and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.☐** Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at
in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION ☒**

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☒ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☐ Over 200 Lbs. |

☐ Other identifying features:

**WITNESS FEES ☐** $          the authorizing traveling expenses   ☐ was paid (tendered) to the recipient
and one days' witness fee:     ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE ☐** I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on   07/19/2023

DENORRIS ANGELO BRI[...]
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on Ma[...] 202[...]

License No.

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO
BOX 1360, WILMINGTON, DE 19899

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

Index No. EF004436-2023

07/08/2023
Calendar No.

CITY OF NEWBURGH

*Plaintiff(s) Petitioner(s)*

against

AGC, INC., F/K/A ASAHI GLASS CO., ET AL.

*Defendant(s) Respondent(s)*

*I~ AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE                 Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at Wilmington, DE

On 07/19/2023                 at 11:45 A .M., at C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801
deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation                 ☒ NOTICE OF ELECTRONIC FILING;

on                 ☒ defendant    ☐ witness       hereinafter called       therein
E.I. DUPONT DE NEMOURS AND COMPANY       ☐ respondent                 the recipient       lamed

**INDIVIDUAL 1.** ☐ by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION 2.** ☒ a DELAWARE           corporation, by delivering thereat a true *copy of each* to ROBIN HUTT-BANKS personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be MANAGING AGENT                 thereof

**SUITABLE AGE PERSON 3.** ☐ by delivering thereat a true copy *of each* to                 a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC. 4.** ☐ by affixing a true copy of *each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.** ☐ Deponent talked to                 at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at                 and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.** ☐ Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at                 in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION** ☒

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☒ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☐ Over 200 Lbs. |

☐ Other identifying features:

**WITNESS FEES** ☐ $           the authorizing traveling expenses       ☐ was paid (tendered) to the recipient
and one days' witness fee:       ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE** ☐ I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on 07/19/2023

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on May 1, 202_

License No.

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO
BOX 1360, WILMINGTON, DE 19899

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

Index No.  EF004436-2023

| | 07/08/2023 |
|---|---|
| | Calendar No. |

CITY OF NEWBURGH                                                    *Plaintiff(s) Petitioner(s)*

against

AGC, INC., F/K/A ASASHI GLASS CO., ET AL.

*Defendant)s) Respondent(s)*

*~ AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE                    Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at  **Wilmington, DE**

On  07/19/2023                    at    11:45 A .M., at  C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801
deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation                    ☒ NOTICE OF ELECTRONIC FILING;

on

THE CHEMOURS COMPANY

☒ defendant    ☐ witness        hereinafter called        therein
☐ respondent                    the recipient        lamed

**INDIVIDUAL**
1. ☐        by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION**
2. ☒        a    DELAWARE            corporation, by delivering thereat a true *copy of each* to    ROBIN HUTT-BANKS
personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said
individual to be  MANAGING AGENT                                thereof

**SUITABLE AGE PERSON**
3. ☐        by delivering thereat a true copy *of each* to                            a person of suitable age and
discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC.**
4. ☐        by affixing a true copy *of each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place
☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age
and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4**
5A. ☐        Deponent talked to                    at said premises who stated that recipient ☐ lived ☐ worked there.
Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient
at recipient's last known residence, at                                and deposited
said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4**
5B. ☐        Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly
addressed to recipient at recipient's actual place of business, at
in an official depository under the exclusive care and custody of the U.S. Postal Service
within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof,
by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION**
☒

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☒ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [ - I Over 6' | | ☐ Over 200 Lbs. |

☐        Other identifying features:

**WITNESS FEES**
☐        $            the authorizing traveling expenses    ☐ was paid (tendered) to the recipient
and one days' witness fee:            ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE**
☐        I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity
whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information
and the grounds of my belief are the conversations and observations narrated. Upon information and belief I aver that the recipient is not
in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on    07/19/2023

License No.

DENORRIS ANGELO BRIT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on May

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO
BOX 1360, WILMINGTON, DE 19899

10 of 13

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE | Index No. | EF004436-2023

CITY OF NEWBURGH | Plaintiff(s) Petitioner(s)

07/08/2023
Calendar No.

against

AGC, INC., F/K/A ASASHI GLASS CO., ET AL. | Defendant)s) Respondent(s)

*~ AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE                    Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at **Wilmington, DE**

On 07/19/2023                    at 11:45 A .M., at  C/O THE CORPORATION TRUST COMPANY, 1209 ORANGE STREET, WILMINGTON, DE 19801 deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation                    ☒ NOTICE OF ELECTRONIC FILING;

on    THE CHEMOURS COMPANY FC, LLC

☒ defendant   ☐ witness      hereinafter called   therein
☐ respondent                 the recipient       lamed

**INDIVIDUAL 1.** ☐ by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION 2.** ☒ a   DELAWARE   corporation, by delivering thereat a true *copy of each* to   ROBIN HUTT-BANKS personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be **MANAGING AGENT**                    thereof

**SUITABLE AGE PERSON 3.** ☐ by delivering thereat a true copy *of each* to                    a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC. 4.** ☐ by affixing a true copy of *each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.** ☐ Deponent talked to                    at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at                    and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.** ☐ Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at                    in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION** ☒

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☐ White Skin | ☒ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☒ Black Skin | ☐ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | ☐ Over 200 Lbs. |

☐   Other identifying features:

**WITNESS FEES** ☐ $                    the authorizing traveling expenses   ☐ was paid (tendered) to the recipient and one days' witness fee:   ☐ was mailed to the witness with subpoena copy.

**MILITARY SERVICE** ☐ I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on   07/19/2023

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on May 1, 2024

License No.

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO
BOX 1360, WILMINGTON, DE 19899

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

*Index No.* EF004436-2023

| | |
|---|---|
| CITY OF NEWBURGH | *Plaintiff(s) Petitioner(s)* |
| against | |
| AGC, INC., F/K/A ASASHI GLASS CO., ET AL. | *Defendant)s) Respondent(s)* |

07/08/2023
Calendar No.

~ *AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE                Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at **Wilmington, DE**

On 07/19/2023 at 12:15 P .M., at C/O CORPORATION SERVICE COMPANY, 251 LITTLE FALLS DRIVE, WILMINGTON, DE 19808 deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation   ☒ NOTICE OF ELECTRONIC FILING;

on CHEMDESIGN PRODUCTS INC.

☒ defendant   ☐ witness   hereinafter called therein
☐ respondent   the recipient lamed

**INDIVIDUAL 1.☐** by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein.

**CORPORATION 2.☒** a DELAWARE corporation, by delivering thereat a true *copy of each* to LYNANNE GARES personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be MANAGING AGENT thereof

**SUITABLE AGE PERSON 3.☐** by delivering thereat a true copy *of each* to a person of suitable age and discretion. Said premises is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state.

**AFFIXING TO DOOR, ETC. 4.☐** by affixing a true copy of *each* to the door of said premises, which is recipient's ☐ actual place of business ☐ dwelling place ☐ usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there

**MAILING TO RESIDENCE USE WITH 3 OR 4 5A.☐** Deponent talked to at said premises who stated that recipient ☐ lived ☐ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 3 OR 4 5B.☐** Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient.

**DESCRIPTION ☒**

| | | | | | |
|---|---|---|---|---|---|
| ☐ Male | ☒ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☐ Black Skin | ☒ Brown Hair | ☐ Balding | ☐ 21-35 Yrs. | ☐ 5'0"-5'3" | ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☒ 5'4"-5'8" | ☒ 131-160 Lbs. |
| | ☐ Brown Skin | ☐ Gray Hair | ☐ Beard | ☒ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. [- I Over 6' | | ☐ Over 200 Lbs. |

☐ Other identifying features:

**WITNESS FEES ☐** $ the authorizing traveling expenses   ☐ was paid (tendered) to the recipient and one days' witness fee:   ☐ was mailed to the witness with subpeona copy.

**MILITARY SERVICE ☐** I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.

Sworn to before me on 07/19/2023

License No.

DENORRIS ANGELO
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires on

KEVIN S. DUNN
BRANDYWINE PROCESS SERVERS, LTD., PO BOX 1360, WILMINGTON, DE 19899

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF ORANGE

|  | Index No. | EF004436-2023 |
|---|---|---|

**CITY OF NEWBURGH**

*Plaintiff(s) Petitioner(s)*

against

**AGC, INC., F/K/A ASASHI GLASS CO., ET AL.**

*Defendant(s) Respondent(s)*

| 07/08/2023 |
|---|
| Calendar No. |

*~ AFFIDAVIT OF SERVICE*

STATE OF DELAWARE, COUNTY OF: NEW CASTLE          Ss.:

The undersigned, being sworn, says: Deponent is not a party herein, is over 18 years of age and resides at **Wilmington, DE**

On **07/19/2023**                        at          **12:15 P** .M., at  **C/O CORPORATE SYSTEMS LLC, 3500 S. DUPONT HIGHWAY, DOVER, DE 19901**
deponent served the within

☒ summons and complaint
☐ subpoena duces tecum
☐ citation      ☒ **NOTICE OF ELECTRONIC FILING;**

on                                              ☒ defendant      ☐ witness      hereinafter called          therein
**DYNAX CORPORATION**                        ☐ respondent                 the recipient          lamed

| INDIVIDUAL 1. ☐ | by delivering a true copy *of each* to said recipient personally; deponent knew the person so served to be the person described as said recipient therein. |
|---|---|
| CORPORATION 2. ☒ | a   **DELAWARE**               corporation, by delivering thereat a true *copy of each* to   **CASEY PINEDA** personally, deponent knew said corporation so served to be the corporation, described in same as said recipient and knew said individual to be  **MANAGING AGENT**                                thereof |
| SUITABLE AGE PERSON 3. ☐ | by delivering thereat a true copy *of each* to                                     a person of suitable age and discretion. Said premises is recipient's ☐  actual place of business ☐  dwelling place ☐  usual place of abode within the state. |
| AFFIXING TO DOOR, ETC. 4. ☐ | by affixing a true copy of *each* to the door of said premises, which is recipient's ☐  actual place of business ☐  dwelling place ☐  usual place of abode within the state. Deponent was unable, with due diligence to find recipient or a person of suitable age and discretion, thereat, having called there |

| MAILING TO RESIDENCE USE WITH 3 OR 4 5A. ☐ | Deponent talked to                          at said premises who stated that recipient ☐ lived ☒ worked there. Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to recipient at recipient's last known residence, at                                and deposited said envelope in an official depository under exclusive care and custody of the U.S. Postal Service within New York State. |
|---|---|
| MAILING TO BUSINESS USE WITH 3 OR 4 5B. ☐ | Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class post paid envelope properly addressed to recipient at recipient's actual place of business, at                          in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the communication was from an attorney or concerned an action against the recipient. |

| DESCRIPTION ☒ | ☐ Male ☒ White Skin ☐ Black Hair ☐ White Hair ☐ 14-20 Yrs. ☐ Under 5' ☐ Under 100 Lbs. |
|---|---|
| | ☒ Female ☐ Black Skin ☒ Brown Hair ☐ Balding ☐ 21-35 Yrs. ☐ 5'0"-5'3" ☐ 100- 130 Lbs. |
| | ☐ Yellow Skin ☐ Blonde Hair ☐ Mustache ☒ 36-50 Yrs. ☒ 5'4"-5'8" ☒ 131-160 Lbs. |
| | ☐ Brown Skin ☐ Gray Hair ☐ Beard ☐ 51-65 Yrs. ☐ 5'9"-6'0" ☐ 161-200 Lbs. |
| | ☐ Red Skin ☐ Red Hair ☐ Glasses ☐ Over 65 Yrs. [- I Over 6' ☐ Over 200 Lbs. |

☐   Other identifying features:

| WITNESS FEES ☐ | $          the authorizing traveling expenses   ☐ was paid (tendered) to the recipient and one days' witness fee:                ☐ was mailed to the witness with subpeona copy. |
|---|---|
| MILITARY SERVICE ☐ | I asked the person spoken to whether recipient was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. Recipient *wore ordinary civilian clothes and no military* uniform. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the recipient is not in military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes. |

Sworn to before me on   07/19/2023

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires  May 1, 2024

License No.

**GRANVILLE MORRIS**
BRANDYWINE PROCESS SERVERS, LTD., PO
BOX 1360, WILMINGTON, DE 19899

STATE OF NEW YORK
SUPREME COURT    ORANGE COUNTY

---

CITY OF NEWBURGH,

    *Plaintiff,*

   *vs.*

AGC, INC., f/k/a Asashi Glass Co., AGC CHEMICALS
AMERICAS INC., AMEREX CORPORATION,
ARCHROMA U.S. INC., ARKEMA INC., BASF
CORPORATION, individually and as successor in interest
to Ciba Inc., CARRIER GLOBAL CORPORATION,
CHEMDESIGN PRODUCTS INC., CHEMICALS, INC.,
CLARIANT CORPORATION, individually and as
successor in interest to Sandoz Chemical Corporation,
CORTEVA, INC., individually and as successor in interest
to DuPont Chemical Solutions Enterprise, DEEPWATER
CHEMICALS, INC., DUPONT DE NEMOURS INC.,
individually and as successor in interest to DuPont Chemical
Solutions Enterprise, DYNAX CORPORATION, E. I.
DUPONT DE NEMOURS AND COMPANY, individually
and as successor in interest to DuPont Chemical Solutions
Enterprise, NATION FORD CHEMICAL COMPANY,
THE CHEMOURS COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, THE CHEMOURS COMPANY FC, LLC,
individually and as successor in interest to DuPont Chemical
Solutions Enterprise, and DOE DEFENDANTS 1-20,
fictitious names whose present identities are unknown

    *Defendants.*

---

**AMENDED COMPLAINT**

Index No.  EF004436-2023

---

   The City of Newburgh ("City" or "Plaintiff"), by and through its attorneys **KNAUF**

**SHAW LLP,** for its Complaint against Defendants AGC Chemicals Americas Inc., Amerex

Corporation, Arkema Inc., Archroma Management LLC, BASF Corporation, Carrier Global

Corporation, Chemdesign Products Inc., Chemicals, Inc., Clariant Corporation, Corteva, Inc.,

1

Deepwater Chemicals, Inc., Dupont De Nemours Inc., Dynax Corporation, E. I. Dupont De Nemours and Company, Nation Ford Chemical Company, The Chemours Company, The Chemours Company FC, LLC, and Doe Defendants 1-20, fictitious names whose identities are presently unknown (collectively "Defendants") and alleges, upon information and belief, as follows:

## GENERAL ALLEGATIONS

1.     Plaintiff brings this action as: 1) the owner of real property ("City Property")[1] in the Towns of New Windsor and Newburgh containing the Washington Lake Reservoir ("Washington Lake"), the primary water supply for the City, portions of the City's drinking water reservoir watershed ("City Watershed")[2], and other parts of the City's public water supply and distribution system ("City Water System"); 2) as a user of waters that flow through the City Watershed; and 3) as the operator of this public water supply system for City residents, businesses and other water users (together "City Water Users", as more fully described below.

2.     This action arises from the foreseeable contamination ("Contamination") of surface water, groundwater, soil and sediment resulting from the use of aqueous film-forming foam ("AFFF") products that contained per- and poly-fluoroalkyl substances ("PFAS") at New York Stewart International Airport ("Airport"), and Stewart Air National Guard Base ("Base").

3.     The Contamination continues to cause injury to the City Property, City Water System, City Watershed, and Washington Lake.

4.     PFAS, also referred to as perfluorinated chemicals ("PFCs"), are a family of synthetic chemicals containing fluorine and carbon atoms.

---

[1] The term "City Property" is defined below in paragraph 191.

[2] The term "City Watershed" is further defined below in paragraph 175.

5.     PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid, and are thus effective in products which require fire resistance, and oil, stain, grease, and water repellency.

6.     PFAS are or have been found in firefighting foams, wire insulation, cleaners, textiles, leather, paper, and paints.

7.     Upon information and belief, there have been at least hundreds of PFAS manufactured, distributed, and sold in the United States.

8.     The two most widely known and studied PFAS are PFOA and PFOS.

9.     PFOS, a perfluoralkyl sulfonate, is an environmentally persistent anthropogenic chemical that is produced synthetically.

10.     PFOA, a perfluoralkyl carboxylate, is an environmentally persistent anthropogenic chemical that is also produced synthetically.

11.     PFASs were first invented in the 1930s.

12.     In or about 1966, AFFF containing PFAS was patented as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and firefighting training facilities.

13.     PFASs are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain.  PFOS and PFOA are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

14.     At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFAS, and/or

3

designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or PFCs contained in AFFF (collectively, "AFFF/Component Products").

15.     Defendants designed, manufactured, marketed, distributed, and/or sold AFFF/Component Products with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by Defendants.

16.     Since its creation in the 1960s, AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants, and/or that contained fluorosurfactants and/or PFCs designed, manufactured, marketed, distributed, and/or sold by Defendants, used as directed and intended by Defendants, and subsequently released into the environment during fire protection, training, and response activities, resulting in widespread PFAS contamination.

17.     Since the 1970s, the United States Armed Forces and civilian airports have been using AFFF to suppress fuel fires. AFFF contains both PFOS and PFOA and is commonly used by civilian firefighters as well.

18.     Through this action, Plaintiff seeks compensatory damages for the harm done to its property and the costs associated with investigating, remediating and monitoring its watershed and water supply contaminated with PFAS due to the use of AFFF at the Airport and the Base.

**PARTIES**

19.     Plaintiff, The City of Newburgh, is a municipal corporation organized under the laws of New York with its principal place of business at 83 Broadway, Newburgh, New York 12550.

20.     In carrying out its duties, Plaintiff is acting for the benefit of the public and for the protection of the health, welfare and prosperity of its customers.

4

21.    Defendant AGC, Inc. ("AGC, Inc.") f/k/a Asahi Glass Co., is a corporation organized under the laws of Japan that does business throughout the United States and has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

22.    Upon information and belief, AGC, Inc. was founded more than a hundred years ago and was the first Japanese producer of sheet glass.

23.    Upon information and belief, AGC, Inc. expanded its operations in the 1960s by developing a fluorochemical business segment that sold products such as the water and oil repellent agents AsahiGuard and fluoropolymer film F-CLEAN.

24.    Upon information and belief, AGC, Inc. designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

25.    Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation and does business throughout the United States. AGC has its principal place of business at 55 E. Uwchlan Ave., Suite 201, Exton, Pennsylvania 19341.

26.    Upon information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of Defendant AGC Inc.

27.    AGC manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

28.    Upon information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

5

29.     Defendant Amerex Corporation ("Amerex") is an Alabama corporation and does business throughout the United States. Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, Alabama 35173.

30.     Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

31.     In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

32.     Upon information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

33.     Defendant Archroma U.S. Inc. ("Archroma") is a North Carolina company and does business throughout the United States. Archroma has its principal place of business at 5435 77 Center Drive, #10 Charlotte, North Carolina 28217.

34.     Upon information and belief, Archroma was formed in 2013 as part of the acquisition of Clariant Corporation's Textile Chemicals, Paper Specialties and Emulsions business by SK Capital Partners.

35.     Upon information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

36.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation and does business throughout the United States. Arkema has its principal place of business at 900 1st

6

Avenue, King of Prussia, Pennsylvania 19406. Upon information and belief, assets of Arkema's
fluorochemical business were purchased by Defendant Dupont in 2002.

37.     Arkema develops specialty chemicals and polymers.

38.     Arkema is an operating subsidiary of Arkema France, S.A.

39.     Upon information and belief, Arkema designed, manufactured, marketed,
distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors
for use in AFFF products.

40.     Defendant BASF Corporation ("BASF") is a corporation organized under the laws
of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham
Park, New Jersey 07932.

41.     Upon information and belief, BASF is the successor-in-interest to Ciba, Inc. (f/k/a
Ciba Specialty Chemicals Corporation).

42.     Upon information and belief, Ciba Inc. designed, manufactured, marketed,
distributed, and sold fluorosurfactants containing PFAS, and/or their chemical precursors for use
in AFFF products.

43.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation and
does business throughout the United States. Carrier has its principal place of business at 13995
Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

44.     Upon information and belief, Carrier was formed in 2020 when United
Technologies Corporation spun off its fire and security business before it merged with Raytheon
Company in April 2020.

45.     Upon information and belief, Carrier designed, manufactured, marketed,
distributed, and sold AFFF products containing PFOS, PFOA, and/or their chemical precursors.

7

46.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Delaware corporation and does business throughout the United States. ChemDesign has its principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

47.     Upon information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

48.     Defendant Chemicals, Inc. ("Chemicals") is a Texas corporation and does business throughout the United States. Chemicals has its principal place of business at 12321 Hatcherville Road, Baytown, Texas 77521.

49.     Upon information and belief, Chemicals supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

50.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

51.     Upon information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz").

52.     Upon information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

53.     Upon information and belief, Clariant supplied PFCs containing PFAS, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

8

54.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation and does business throughout the United States. Deepwater's principal place of business is at 196122 E County Road 735, Woodward, Oklahoma 73801.

55.     Upon information and belief, Deepwater designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

56.     Defendant Dynax Corporation ("Dynax") is a Delaware corporation that conducts business throughout the United States. Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

57.     Upon information and belief, Dynax entered into the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

58.     Upon information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

59.     Defendant E. I. du Pont de Nemours and Company ("DuPont"), is a Delaware corporation and does business throughout the United States. DuPont has its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

60.     Defendant The Chemours Company ("Chemours"), is a Delaware corporation and does business throughout the United States. Chemours has its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

9

61.     In 2015, DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities which Chemours assumed, including those related to PFOS and PFOA and fluorosurfactants.

62.     Upon information and belief, Chemours has supplied fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors to manufacturers of AFFF products.

63.     Upon information and belief, Chemours was incorporated as a subsidiary of DuPont as of April 30, 2015. From that time until July 2015, Chemours was a wholly-owned subsidiary of DuPont.

64.     In July 2015, DuPont spun off Chemours and transferred to Chemours its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours stock to DuPont stockholders, and Chemours has since been an independent, publicly traded company.

65.     Defendant The Chemours Company FC, LLC ("Chemours FC"), is a Delaware corporation and does business throughout the United States. Chemours has its principal place of business at 1007 Market Street, Wilmington, Delaware 19899. Chemours FC is a subsidiary of The Chemours Company.

66.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that conducts business throughout the United States. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

67.     Defendant Du Pont de Nemours Inc. (f/k/a DowDuPont, Inc.) ("DowDuPont"), is a Delaware corporation and does business throughout the United States. DowDuPont has its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

10

68. Upon information and belief, DowDupont was created in 2015 to transfer Chemours and DuPont liabilities for manufacturing and distributing flourosurfactants to AFFF manufacturers.

69. On June 1, 2019, DowDupont separated its agriculture business through the spin-off of Corteva.

70. Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

71. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend.

72. Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

73. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

74. Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont Entities" throughout this Complaint.

75. Upon information and belief, DuPont Entities designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

11

Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 87 of 136

76.     Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina company and does business throughout the United States. Nation Ford has its principal place of business at 2300 Banks Street, Fort Mill, South Carolina 29715.

77.     Upon and belief, Nation Ford supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

78.     Doe Defendants 1-20 are unidentified entities or persons whose names are presently unknown and whose actions, activities, omissions  (a) may have permitted, caused and/or contributed to the contamination of the City Watershed and/or the City Property, including but not limited to Washington Lake; or (b) may be vicariously responsible for entities or persons who permitted, caused and/or contributed to the contamination of the City Watershed and/or the City Property, including but not limited to Washington Lake; or (c) may be successors in interest to entities or persons who permitted, caused and/or permitted, contributed to the contamination of the City Watershed and/or the City Property, including but not limited to Washington Lake. After reasonable search and investigation to ascertain the Doe Defendants actual names, the Doe Defendants' actual identities are unknown to Plaintiff as upon information and belief they are not linked with any of the Defendants on any public source.

79.     The Doe Defendants 1-20 either in their own capacity or through a party they are liable for: (1) designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFOS, PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or PFCs contained in AFFF/Component Products; or (2) used, handled, transported, stored, discharged, disposed of, designed, manufactured, marketed, distributed, and/or sold PFOS, PFOA, and/or their chemical precursors, or other non-AFFF products containing PFOS, PFOA, and/or their chemical

12

precursors; or (3) failed to timely perform necessary and reasonable response and remedial measures to releases of PFOS, PFOA, and/or their chemical precursors, or other non-AFFF products containing PFOS, PFOA, and/or their chemical precursors in to the environment contaminating the City Watershed and/or the City Property, including Washington Lake.

80.     Defendants AGC, Inc., AGC, Archroma, ChemDesign, Chemicals, Clariant, Deepwater, Dupont Entities, and Nation Ford are collectively referred to in this Complaint as the "PFC Defendants."

81.     Upon information and belief, the PFC Defendants supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products containing PFAS, including but not limited to PFOA and PFOS, that were stored, handled, used, trained with, tested equipment with, were otherwise discharged and or disposed of at the Airport and/or the Base and which have contaminated the City Watershed, the City Property, and the City Water System.

82.     Defendants Amerex and Carrier are collectively referred to as "AFFF Defendants" in this Complaint.

83.     Upon information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS, that were stored, handled, used, trained with, tested equipment with, were otherwise discharged and or disposed of at the Airport and/or the Base and which have contaminated the City Watershed, the City Property, and the City Water System.

84.     Defendants Arkema, BASF, ChemDesign, Deepwater, Dupont Entities, and Dynax are collectively referred to in this Complaint as the "Fluorosurfactant Defendants."

Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 89 of 136

85.     Upon information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, were otherwise discharged and or disposed of at the Airport and/or the Base and which have contaminated the City Watershed, the City Property, and the City Water System.

86.     All Defendants, at all times material herein, acted by and through their respective agents, servants, officers and employees, actual or ostensible, who then and there were acting within the course and scope of their actual or apparent agency, authority or duties. Defendants are liable based on such activities, directly and vicariously.

## JURISDICTION AND VENUE

87.     This Court has jurisdiction because Defendant Dynax Corporation's principal place of business is located at 103 Fairview Park Drive, Elmsford, New York 10523; and Defendant Clariant Corporation is a New York corporation.

88.     Venue is proper in Orange County because the Airport, the Base , the City Property, the City Watershed, and Washington Lake are located there, and because the events related to the claims in this Complaint occurred in Orange County.

89.     This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with New York, including, among other things, purposefully marketing, selling and/or distributing their AFFF/ Component products to and within New York, and because they have the requisite minimum contacts with New York necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

14

90.    This action is brought by Plaintiff as a public water supplier, and is timely because the applicable statute of limitations is CPLR §214-h.

91.    Plaintiff commenced and is prosecuting a lawsuit against other defendants arising out of the same nucleus of facts and many of the same legal theories as this case, in the United States District Court for the Southern District of New York, entitled *City of Newburgh v. United States of America, et al.*, Civil Action No. 7:18-cv-07057 *("Newburgh v. USA")*. That case has been joined in Multi-District Litigation in the United States District Court for the District of South Carolina, Charleston Division, entitled *In Re: Aqueous Film-forming Foams Products Liability Litigation*, MDL No. 2873 (the "AFFF MDL").

92.    Moreover, lawsuits and claims ("City Water User Claims") have been brought by alleged City Water Users against the City complaining, *inter alia*, that the City supplied deficient water, some of which were also transferred to the AFF MDL.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### A.    PFOA and PFOS and Their Risk to Public Health

93.    PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

94.    The two most widely studied types of these substances are PFOA and PFOS.

95.    PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

15

96.     PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

97.     PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

98.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

99.     PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

100.    PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

101.    The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

102.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

103.    PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

16

## B.    Defendants' Manufacture and Sale of AFFF/Component Products

104.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

105.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

106.    AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

107.    Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

108.    AFFF can be made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

109.    AFFF that contains fluorosurfactants, however, is better at extinguishing hydrocarbon fuel-based fires due to their surface-tension lowering properties, essentially smothering the fire and starving it of oxygen.

110.    The fluorosurfactants used in other AFFF products sold by the AFFF Defendants were manufactured by the Fluorosurfactant Defendants through the process of telomerization.

111.    The PFCs that the Fluorosurfactant Defendants needed to manufacture those fluorosurfactants contained PFOS, PFOA, and/or their chemical precursors, and were designed, manufactured, marketed, distributed and/or sold by the PFC Defendants.

17

112.    Upon information and belief, the PFC and Fluorosurfactant Defendants were aware that the PFCs and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in the AFFF products designed, manufactured, marketed, distributed, and/or sold by the AFFF Defendants.

113.    Upon information and belief, the PFC and Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and/or sold the PFC and/or fluorosurfactants contained in the AFFF products discharged into the environment at the City of Newburgh during fire protection, training, and response activities, resulting in widespread PFAS contamination.

114.    Upon information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment during fire protection, training, and response activities, as well as during reasonably foreseeable accidental releases and spills, resulting in widespread PFAS contamination at the Airport, the Base, in the City Watershed and the City Water System and on the City Property.

## C. Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFAS

115.    Upon information and belief, by at least the 1970s DuPont knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

116.    Upon information and belief, DuPont concealed from the public and government agencies its knowledge of the threats to public health and the environment posed by PFAS.

117.    Some or all of the Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment after their first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

18

i. 1940s and 1950s: Early Warnings About the Persistence of AFFF

118.    In 1947, The 3M Company, f/k/a Minnesota Mining and Manufacturing Co. ("3M")[3], started its fluorochemical program, and within four years, it began selling its PFOA to DuPont.  The persistence and contaminating nature of the fluorosurfactants contained in AFFF products were understood prior to their commercial application at 3M's Cottage Grove facility in Minnesota.

119.    The inventor of 3M's patented process of electrochemical fluorination ("ECF") was J.H. Simons.  Simons' 1948 patent for the ECF process reported that PFCs are "non-corrosive, and of little chemical reactivity," and "do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures."[4]

120.    Simons further reported that fluorosurfactants produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. 3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[5]

121.    The thermal stability of 3M's fluorosurfactants was also understood prior to commercial production.  Simons' patent application further discloses that the fluorosurfactants produced by the ECF process were thermally stable at temperatures up to 750° C (1382º F).

---

[3] 3M was sued by the City of Newburgh in *Newburgh v. USA*.

[4] Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf.

[5] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, *available* at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.

Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds.[6]

122.    Nowhere in any Material Safety Data Sheet for any of Defendants' AFFF/Component Products is information on the thermal stability of those products disclosed. Failure to disclose knowledge of the stability of the PFCs and fluorosurfactants used in AFFF products to customers is a failure to warn just how indestructible the AFFF's ingredients are when released to unprotected water sources and even treatment plants.

ii.  1960s: AFFF's Environmental Hazards Come into Focus

123.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

124.    One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[7]  Thus, 3M knew by the mid-1960s that its surfactants were immune to chemical and biological degradation in soils and groundwater.

125.    3M also knew by 1964 that when dissolved, fluorocarbon carboxylic acids and fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions. Later studies by 3M on the adsorption and mobility of FC-95 and FC-143

---

[6] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

[7] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

(the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in
soils for both compounds.[8]

### iii.  1970s: Internal Studies Provide Evidence of Environmental and Health Risks

126.    Upon information and belief, by the mid-1970s, some Defendants had an intimate
understanding of the persistent nature of PFCs.  A 1976 study, for example, observed no
biodegradation of FC-95, the potassium salt of PFOS.

127.    In 1977, The Ansul Company[9] ("Ansul") authored a report titled "Environmentally
Improved AFFF," which acknowledged that releasing AFFF into the environment could pose
potential negative impacts to groundwater quality.[10]  Ansul wrote: "The purpose of this work is to
explore the development of experimental AFFF formulations that would exhibit reduced impact
on the environment while retaining certain fire suppression characteristic . . . improvements [to
AFFF formulations] are desired in the environmental area, i.e., development of compositions that
have a reduced impact on the environment without loss of fire suppression effectiveness."  Thus,
Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet
there is no evidence that Ansul (or any other Defendant) ever pursued initiatives to do so.

128.    A 1978 3M biodegradation study likewise reported that an "extensive study
strongly suggest[ed]" one of its PFCs is "likely to persist in the environment for extended period
unaltered by metabolic attack."[11]  A year later, a 3M study reported that one of its fluorosurfactants

---

[8] Technical Report Summary re : Adsorption of FC 95 and FC143 on Soil, Feb. 27, 1978, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

[9] Ansul was sued by the City of Newburgh in *Newburgh v. USA*.

[10] Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977, *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/a050508.pdf.

[11] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - II, Jan. 1, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf.

21

"was found to be completely resistant to biological test conditions," and that it appeared waterways were the fluorosurfactant's "environmental sink."[12]

129. In 1979, 3M also completed a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[13] More than a decade after 3M began selling AFFF containing fluorosurfactants it wrote: "there has been a general lack of knowledge relative to the environmental impact of these chemicals." The report ominously asked, "If these materials are not biodegradable, what is their fate in the environment?"

130. During the 1970s, 3M also learned that the fluorosurfactants used in AFFF accumulated in the human body and were "even more toxic" than previously believed.

131. In 1975, 3M learned that PFAS was present in the blood of the general population.[14] Since PFOA and PFOS are not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of this PFOS. The finding also should have alerted 3M to the possibility that PFOS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain how PFOS from 3M's products ended up in human blood.

132. In 1976, 3M found PFAS in the blood of its workers at levels "up to 1000 times 'normal' amounts of organically bound fluorine in their blood."[15] This finding should have alerted 3M to the same issues raised by the prior year's findings.

---

[12] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - III, July 19, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1179.pdf.

[13] Technical Report Summary, Final Comprehensive Report on FM 3422, Feb. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2563.pdf.

[14] Memorandum from G.H. Crawford to L.C. Krogh et al. re: Fluorocarbons in Human Blood Plasma, Aug. 20, 1975, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1118.pdf.

[15] 3M Chronology – Fluorochemicals in Blood, Aug. 26, 1977, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1144.pdf.

22

133.    Studies by 3M in 1978 showed that PFOA reduced the survival rate of fathead minnow fish eggs,[16] that PFOS was toxic to monkeys,[17] and that PFOS and PFOA were toxic to rats.[18] In the study involving monkeys and PFOS, all of the monkeys died within days of ingesting food contaminated with PFOS.

134.    In 1979, 3M and DuPont discussed 3M's discovery of PFOA in the blood of its workers and came to the same conclusion that there was "no reason" to notify the United States Environmental Protection Agency ("EPA") of the finding.[19]

iv. 1980s and 1990s: Evidence of AFFF's Health Risks Continues to Mount

135.    By the end of the 1980s, additional research and testing performed by Defendants, including DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

136.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.

---

[16] The Effects of Continuous Aqueous Exposure to 78.03 on Hatchability of Eggs and Growth and Survival of Fry of Fathead Minnow, June 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1176.pdf.

[17] Ninety-Day Subacute Rhesus Monkey Toxicity Study, Dec. 18, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1191.pdf; Aborted FC95 Monkey Study, Jan. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1193.pdf.

[18] Acute Oral Toxicity (LD$_{50}$) Study in Rats (FC-143), May 5, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1170.pdf; FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, Mar. 20, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.

[19] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.

23

137. A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. Upon information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

v. Defendants Hid What They Knew from the Government and the Public.

138. Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e)

139. In December 2005, the EPA announced it was imposing the "Largest Environmental Administrative Penalty in Agency History" against DuPont based on evidence that it violated the TSCA by concealing the environmental and health effects of PFOA.

140. Upon information and belief, Defendants knew or should have known that AFFF containing PFOA or PFOS would very likely injure and/or threaten public health and the environment, even when used as intended or directed.

141. Defendants failed to warn of these risks to the environment and public health, including the impact of their AFFF/Component Products on the quality of unprotected water sources.

142. Defendants were all sophisticated and knowledgeable in the art and science of designing, formulating, and manufacturing AFFF/Component Products. They understood far more about the properties of their AFFF/Component Products—including the potential hazards

24

they posed to human health and the environment—than any of their customers. Still, Defendants declined to use their sophistication and knowledge to design safer products.

## D. The Impact of PFOS and PFOA on the Environment and Human Health Is Finally Revealed

143. Upon information and belief, Defendants failed to comply with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF/Component Products. *See* TSCA § 8(e).

144. Once the truth about PFOS and PFOA was revealed, researchers began to study the environmental and health effects associated with them, including a "C8 Science Panel" formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

145. The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

146. Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birth weight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

147. The injuries caused by PFAS can arise months or years after exposure.

148. Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links"

25

with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

149.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

150.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

151.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[20]

152.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions,

---

[20] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 FR 26072 (May 2, 2012).

limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[21]

153. On May 25, 2016, the EPA released a lifetime health advisory (HAs) and health effects support documents for PFOS and PFOA.[22] The EPA developed the HAs to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAs identify the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAs were based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and were also informed by epidemiological studies of human populations exposed to PFOS. These studies indicate that exposure to PFOS and PFOA over these levels may result in adverse health effects, including:

a. Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

b. Cancer (testicular and kidney);

c. Liver effects (tissue damage);

d. Immune effects (e.g., antibody production and immunity);

e. Thyroid disease and other effects (e.g., cholesterol changes).

---

[21] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[22] *See Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate*, 81 FR 33250 (May 25, 2016).

27

154.    In addition, PFOS and PFOA are hazardous materials because they pose a "present or potential threat to human health."[23]

155.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[24]

156.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of... PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is... credible."[25]

157.    California has listed PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[26]

---

[23] *Id.*; *see also National Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 3, 6 (D.C. Cir. 2015) (referring to PFOS as a "toxic compound" and a "hazardous chemical.").

[24] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf

[25] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

[26] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017, *available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause.

28

158.    On March 3, 2017, New York State added PFOA and PFOS to the list of hazardous substances at 6 NYCRR §597.3 and prohibited the use of AFFF containing PFOA or PFOS by April of 2017.

159.    On August 26, 2020, New York State imposed maximum contaminant levels ("MCLs") of 10 ppt for PFOS and PFOA for public drinking water supplies.[27]

160.    On March 14, 2023, the EPA announced proposed a National Primary Drinking Water Regulation for six PFAS including PFOA and PFOS.[28]  The proposed rule sets MCLs for public drinking water supplies of 4.0 parts per trillion ("ppt" or ng/L) for PFOA and PFOS, with a proposed Maximum Contaminant Level Goals of zero (0).

### E.    AFFF Containing PFOS and PFOA Is Fungible and Commingled in the Groundwater and Surface Water

161.    AFFF containing PFOS and/or PFOA, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

162.    A subsurface or surface water plume, even if it comes from a single location, such as a retention pond or fire training area, normally originates from mixed batches of AFFF and chemical feedstock coming from different manufacturers.

163.    Because precise identification of the specific manufacturer of any given AFFF/Component Product that was a source of the PFAS found at the Airport or the Base, during fire protection, training, and response activities, resulting in widespread PFAS contamination is nearly impossible, given certain exceptions, Plaintiffs must pursue all Defendants, jointly and severally.

---

[27] 10 NYCRR Subpart 5-1.

[28] *PFAS National Primary Drinking Water Regulation Rulemaking,* 88 FR 18639 (March 29, 2023).

164.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/Component Products containing PFOS and PFOA, at Plaintiffs' expense, and to attempt to avoid liability.

**F. Contamination Caused by the Use of AFFF**

i.  The City Property

165.    The City is located in Orange County, New York, on the Hudson River about 60 miles north of New York City.

166.    The City has been listed by the New York State Department of Environmental Conservation ("NYSDEC") as a potential Environmental Justice Area.

167.    The City is the owner of property ("Washington Lake Property") located at 660 Little Britain Road, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-1-12.2), which is approximately 254.96 acres, 660 Little Britain Road, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-1-10), which is approximately 52.9 acres, and Old Little Britain Road, in the Town of Newburgh, Orange County, New York (tax parcel identification no. 97-3-10), which is approximately 25.4 acres.

168.    The Washington Lake Property is located about three miles to the west of the City.

169.    The City pays real property taxes to the Town of New Windsor for the Washington Lake Property.

170.    The Washington Lake Property is the location of Washington Lake.

171.    Washington Lake is a State Class A waterbody pursuant to New York Environmental Conservation Law ("ECL") Article 15 (Water Index No. H-89-2-P225).

172.    Class A fresh surface waters are best used as "a source of water supply for drinking, culinary or food processing purposes; primary and secondary contact recreation; and fishing.  The

30

waters shall be suitable for fish, shellfish, and wildlife propagation and survival." 6 N.Y.C.R.R. §701.6.

173. Prior to on or about May 2, 2016, Washington Lake served as the primary water intake source for the City Water System (Water System ID NY3503503549), to supply drinking water to at least 28,000 residents and other water users.

174. Washington Lake receives water from sources including the drainage basins of Silver Stream and its tributaries (Class A waterbodies), Patton Brook and its tributaries (Class A waterbodies), the New York State Route 300 storm sewer network, surface water runoff and groundwater recharge ("Washington Lake Source Water").

175. In addition to Washington Lake Source Water, the City Watershed includes lands west of Washington Lake, including land through which the New York State Thruway (I-87), Route 207 and Route 300 pass, all of the Base Property, all of or a portion of the Airport Property, and Brown's Pond ("City Watershed").

176. The City also owns the water treatment plant ("City Water Treatment Plant") at property ("Water Treatment Plant Property") located at 493 Little Britain Road, Newburgh, New York 12550 (tax parcel identification nos. 97-3-17 and 97-3-17.1) and Highway 207, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-1-35), together with all of the water treatment equipment located on that property, as well as the water distribution system consisting of piping, valves, hydrants, pump stations, raw water and finished water storage tanks.

177. The City's water distribution system required the production of approximately 3 million gallons of water per day ("MGD").

178.     Diversion gates ("Silver Stream Diversion") from an impoundment near the junction of Routes 300 and 207 in the Town of New Windsor, Orange County, New York (tax parcel identification no. 4-3-1.1) ("Silver Stream Diversion Property") divert water from Silver Stream into the south side of Washington Lake.

179.     The City owns the Silver Stream Diversion Property.

180.     Tributaries feed Silver Stream upstream from the Silver Stream Diversion.

181.     Some of these tributaries and their sources originate on the Airport Property and/or the Base Property.

182.     The headwaters of one of Silver Stream's tributaries is a pond, referred to as Recreation Pond ("Rec Pond").

183.     Rec Pond is located on the southeast side of the Base Property and/or the Airport Property and receives surface water and sewer discharges from the Base and the Airport.

184.     In or about 1922, the uppermost reach of Silver Stream was impounded to create Brown's Pond (a/k/a Silver Stream Dam Reservoir), a reservoir located in Town of New Windsor, Orange County, New York (tax parcel identification no. 32-2-53) ("Brown's Pond Property").

185.     The City of Newburgh owns Brown's Pond (Water Index No. H-P 225-1-2 and P226a), and pays real property taxes to the Town of New Windsor for the Brown's Pond Property.

186.     Brown's Pond provides headwaters for Silver Stream.

187.     Brown's Pond is recharged naturally from groundwater and surface water flow, and does not receive water from Silver Stream.

188.     Patton Brook, lies west of Route 300 in the Town of Newburgh, and is diverted into Washington Lake through a channel called Murphy's Ditch (tax parcel identification no. 97-2-22.1) to the north side of Washington Lake.

32

189.     The City owns Murphy's Ditch.

190.     The City owns several additional pieces of property which facilitate its water service, including tax parcel identification nos. 4-1-9.21, 4-1-12.2 and 4-1-38 in the Town of New Windsor, Orange County, New York ("Additional Water Supply Parcels").

191.     The Washington Lake Property, Water Treatment Plant Property, Brown's Pond Property, Murphy's Ditch, Silver Stream Diversion Property, and Additional Water Supply Parcels are all portions of the "City Property," as used in this Complaint.

192.     The Catskill Aqueduct, which provides water to the City of New York and other local municipalities, passes to the north of Brown's Pond.

193.     In accordance with an agreement with NYCDEP, the City may withdraw Catskill Aqueduct water when needed at a significant cost.

194.     In order to provide water from the Catskill Aqueduct, NYCDEP made improvements to the City Water System connection to the Catskill Aqueduct west siphon and constructed the Brown's Pond blow-off structure on property identified as the Silver Stream (Brown's Pond) Station at 174 Mount Airy Road, in the Town of New Windsor, Orange County, New York (tax parcel identification no. 32-2-52) ("Brown's Pond Station").

195.     The City has paid and is required to pay an annual permit fee ("Annual NYCDEP Permit Fee") to NYCDEP for these improvements to provide the City with clean water from the Catskill Aqueduct.

196.     As a result of the Contamination, the City expects that it will be required to purchase water from the NYCDEP in perpetuity, except to the extent it can safely utilize Brown's Pond, unless the sources of the Contamination and the Contamination in the City Watershed are fully remediated and all PFAS is removed.

33

197.    As a result, the City has sustained lost profits.

ii.  The Base

198.    Base operations are located on the Base Property, which is located at 1 Maguire Way, Newburgh, New York 12550, and is composed of portions of at least two parcels (tax parcel identification numbers 89-1-79 in the Town of Newburgh, Orange County, New York, and 3-1-63.2 in the Town of New Windsor, Orange County, New York).  The Base Property is approximately 2.5 miles west of Washington Lake.

199.    The Base Property is generally bounded by the Airport Property on the west, Route 17K to the north, Route 87 to the east, and primarily vacant land and land used for minor Base or Airport operations.

200.    The Base Property is located upgradient from Washington Lake.

201.    The Base Property is located in the City Watershed.

202.    The Airport Property includes property previously known as Stewart Air Force Base ("Stewart AFB").  For the purpose of this Complaint, references to the Airport Property shall include property formerly used as Stewart AFB.

203.    Upon information and belief, since the late 1960s and to the present date, at the Base Property, AFFF containing PFAS has been extensively used at crash sites, training areas, fuel tanker areas, Hangars 100-102, and fire station buildings, fire truck maintenance buildings, among other locations, without containment measures, and/or with inadequate or failing containment measures, leading to the foreseeable Disposals of PFAS into the surface water, groundwater, soil, and sediment at the Base Property and City Watershed, and the foreseeable Contamination of Washington Lake with PFAS.

34

204. Upon information and belief, since the late 1960s, Discharges and Releases also likely occurred from inadequate and/or leaking storm and/or sanitary sewer systems, inadequate and/or leaking industrial waste systems, inadequate and/or leaking Lagoons, broken valves, leaking storage tanks, and during testing of fire suppression systems, false alarms, and maintenance, all without containment measures and/or with inadequate or failing containment measures, leading to the foreseeable release of Hazardous Substances, including PFAS, into the surface water, soil, groundwater, and sediment at the Base Property and City Watershed, and the foreseeable Contamination of Washington Lake with Pollutants, including PFAS.

iii.    The Airport

205. Airport operations are located on the Airport Property, which is located at 1180 1st Street, New Windsor, New York 12553, and is composed of numerous parcels in the Town of Newburgh and Town of New Windsor, Orange County, New York.

206. The Airport Property is approximately 2.5 miles west of the City.

207. The Airport Property is located upgradient from Washington Lake.

208. The Airport Property is partially located in the City Watershed.

209. Upon information and belief, some or all of the Airport Property was previously operated as Stewart AFB, a military installation owned and/or operated by one or more of the Federal Defendants.

210. Upon information and belief, since the late 1960s and to the present date, at the Airport Property, AFFF containing PFAS has been extensively used at crash sites, fuel tanker areas, training areas, fire suppression system testing areas, the Former Nozzle Testing Area, Building 142, and Building 2241, among other locations, without containment measures and/or with inadequate or failing containment measures, leading to the foreseeable release or disposal of

35

Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 111 of 136

PFAS into the surface water, groundwater, and sediment at the Airport Property and the City Watershed, and the foreseeable Contamination of Washington Lake with PFAS.

211.    Upon information and belief, since the late 1960s, releases and disposals of PFAS likely occurred at the Airport Property from leaking storage tanks, inadequate and/or leaking storm sewer systems, inadequate and/or leaking industrial waste streams, broken valves, and during testing of fire suppression systems, false alarms and maintenance, without containment measures and/or with inadequate or failing containment measures, leading to the foreseeable disposal and release of PFAS into the surface water, groundwater, soil, and sediment at the Airport Property and City Watershed, and the foreseeable Contamination of Washington Lake with PFAS.

212.    Upon information and belief, AFFF containing PFAS is currently stored and used at the Airport on the Airport Property.

iv.  The Contamination

213.    In 2009, EPA issued the Provisional Health Advisories setting the Provisional Levels of 200 ppt for PFOS and 400 ppt for PFOA[29].

214.    In or about April 2014, the City began testing Washington Lake influent to the Water Treatment System for six PFAS—PFOS, PFOA, PFNA, PFHxS, PFHpA, and PFBS—pursuant to the EPA's Third UCMR.

215.    Upon information and belief, from December 2013 through March 2016, at least four samples were collected from Washington Lake influent which had detections of PFOS between 140 and 170 ppt and PFOA at 27 ppt. The PFOS and PFOA levels were below the EPA 2009 Provisional Health Advisory in place at the time.

---

[29] *Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, January 8, 2009; *available at* https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.

216.     Upon information and belief, from December 2013 through March 2016, at least four samples were collected from Washington Lake which had detections of PFNA of 5.7 ppt, PFHxA of 65 ppt, PFBS of 20.9 ppt, and PFHpA between 17 ppt and 21.6 ppt. No provisional standards were in place at the time for these PFAS compounds.

217.     As a precautionary measure, on or about May 2, 2016, the City switched the City Water System supply from Washington Lake to Brown's Pond.

218.     At the time of the City's switchover, the 2009 EPA Provisional Levels were still in effect, and neither PFOS nor PFOA had been detected above the Provisional Levels in the City's water supply.

219.     After the City's switchover to Brown's Pond, on May 19, 2016, EPA announced that it had developed the new HAs for PFOA and PFOS, reducing the levels to a combined limit of 70 ppt.

220.     On or about June 7, 2016, due to decreased water levels in Brown's Pond, the City began providing its residents water blended water from Brown's Pond and the Catskill Aqueduct.

221.     By June 13, 2016, the City provided water only from the Catskill Aqueduct. The Catskill Aqueduct water contained no measurable PFAS.

222.     Later sampling performed by NYSDEC in 2017 revealed trace amounts of PFAS in Brown's Pond below the levels set by the Health Advisories.

223.     As a result of the Contamination, the City expects that it will be required to purchase water from the NYCDEP in perpetuity, except to the extent it can use Brown's Pond during colder months when water levels are higher and the water is cleaner and free of algae, and when there are not unsafe levels of PFAS, unless the sources of the Contamination and the Contamination in the City Watershed and Washington Lake are eliminated and fully remediated.

37

224. If the State stops providing funds to cover the cost to pay for clean Catskill Aqueduct water, the City will be required to increase water rates by approximately 45%.

225. Such an increase is not affordable for City residents and other water users.

226. Beginning in or about March of 2016, the NYSDEC began a limited investigation of the surface water, groundwater, and sediment in the City Watershed, including the Base Property, Airport Property, Silver Stream, Brown's Pond and Patton Brook, Washington Lake, and other water bodies that, upon information and belief, do not feed Washington Lake.

227. NYSDEC first provided the City with lab results from that testing on or about May 9, 2016.

228. Upon information and belief, NYSDEC's and NYANG's limited investigations identified PFAS contamination in the City Watershed and Washington Lake as follows:

Washington Lake

- March 2016 samples: PFOS identified in Washington Lake surface water at levels up to 243 ppt.
- September 30, 2016 and December 1, 2016 drawdown activities conducted between samples: PFOS was identified in Washington Lake surface water at levels up to 800 ppt. The other five PFAS compounds analyzed all had reported values above their respective reporting limits ranging from 11.1 ppt (PFBS) to 73 ppt (PFHxS).
- August 2017 samples: PFOS identified in Washington Lake surface water at levels up to 170 ppt. Eleven other PFAS, including PFOA (30 ppt), PFHxS (69 ppt), and PFNA (20 ppt), were detected ranging from 2.4 ppt to 69 ppt. Low levels of PFAS were also identified in the sediment at the bottom of Washington Lake.

Silver Stream

- March through May 2016 samples: PFOS identified in Silver Stream surface water at levels up to 290 ppt.
- October 2017 samples: PFOS measured in the Rec Pond tributary surface water to Silver Stream at levels up to 11,800 ppt. PFOS measured in surface water in the Silver Stream diversion into Washington Lake at levels up to 181 ppt and total PFAS[30] of 433 ppt.
- October and November 2017 samples: PFOS measured in Silver Stream surface

---

[30] Upon information and belief "Total PFAS" include any and all PFAS that were sampled for, and may include up to 21 compounds, but not all PFAS that have been manufactured or used by Defendants.

38

water at levels up to 281 ppt.

Patton Brook

- May 2016 samples: PFOS identified in Patton Brook surface water at levels up to 11.3 ppt.

Base Property

- March 2016 and May 2016 samples: PFOS measured in the surface waters at Base Outfalls A, 002, 003, 017K, and 010 located at Rec Pond at a range of 60 ppt to 5,900 ppt.
- June 2016 samples: PFOS identified in the groundwater at sampling locations surrounding the apron on the Base Property at 21 ppt, 190 ppt, and 3,160 ppt.
- June 2016 and September 2016 samples: PFOS identified in the catch basin water at sample locations surrounding the apron on the Base Property ranging from 14 ppt to 6,990 ppt.
- August 2016 samples: PFOS identified in the surface soil at sample locations surrounding the apron on the Base Property at 320 ppt, 470 ppt, and 5,620 ppt.
- September 2016 samples: PFOS, PFOA, and other PFAS identified in nine surface water samples on the Base Property. PFOS was identified at a range of 17 ppt to 3610 ppt; PFOA was identified at a range of 13 ppt to 520 ppt; total PFAS ranged from 74 ppt to 5,843 ppt.
- September 2016 samples: The total PFAS identified in groundwater on the Base Property at MW-3 measured at 368 ppt.
- March 2017 samples: PFOS identified in the surface waters of the floor drains at the Base Property at the Firehouse at concentrations up to 480,000 ppt.
- October 2017 samples: PFOS identified in the Retention Basin surface water at 2,520 ppt.
- October and November 2017 samples: PFOS measured in the surface water at Base Outfalls 002, 003 and 010 located at Rec Pond at range of 607 to 1,710 ppt. PFOS identified in groundwater on the Base Property at the following Potential Release Locations ("PRL"): PRL-1 at 137 ppt; PRL-2 at 174 ppt; PRL-3 at 714 ppt; PRL-15 at 4,920 ppt; and the former base landfill at 262 ppt. PFOS identified in the surface soils at various locations throughout the Base at concentrations up to 520,000 ppt. The Total PFAS identified in groundwater on the Base property ranged from 7 ppt to 11,562 ppt. The Total PFAS identified in groundwater downgradient of the Base ranged from 34 ppt to 3,344 ppt.

Airport Property

- June 2016 samples: Combined measure of PFOS and PFOA in soil on the runway near Airport Outfall 003 at a range of 6,680 ppt to 1,845,680 ppt, and total PFAS ranging from 7,400 ppt to 1,897,580 ppt. Combined measure of PFOS and PFOA in soil just north and northeast of Building 142 at a range of 6,370 ppt to 596,670 ppt, and total PFAS ranging from 7,730 ppt to 619,140 ppt.
- July 2016 samples: Combined measure of PFOS and PFOA in the surface waters

39

at Airport Outfalls 003, 005, 008, 010, 011, and 013 at a range of 19 ppt to 306 ppt, and total PFAS ranging from 14 ppt to 462 ppt.

- July 2016 samples: PFOS in groundwater north of the runway ranging from 120 ppt to 340 ppt.

Downgradient of Base Property

- May 2018 samples: PFOS and Total PFAS (limited to six (6) UCMR-3 PFAS compounds) measured in surface water in the tributary downstream of Recreation Pond were 439 ppt and 682 ppt, respectively. PFOS and Total PFAS measured in surface water in Silver Stream were 176 ppt and 259 ppt, respectively. PFOS and Total PFAS measured in surface water in the Silver Stream Diversion to Lake Washington were 108 ppt and 209 ppt, respectively.
- May 2018 samples: PFOS and Total PFAS in groundwater at monitoring wells distal to the Base and along Route 209 were 18 ppt and 133 ppt, respectively.
- April 2019 samples: PFOS and Total PFAS (limited to six (6) UCMR-3 PFAS compounds) measured in surface water entering and in Recreation Pond at 490 ppt and 717 ppt, respectively.

229.    Upon information and belief, in 2017 trace levels of PFAS were identified in Brown's Pond below the HAs.

230.    Environmental investigations of the Base Property are in progress, but remedial action has not commenced, and discharges have not ceased.

231.    This work has resulted in a study released on October 31, 2018, entitled "Phase I Regional Site Inspections Per- And Polyfluoroalkyl Substances," along with an Addendum released on March 1, 2019.

232.    That study documented multiple areas of PFAS Contamination in soil, sediments, surface water and groundwater on and downstream from the Base Property, including Rec Pond.

233.    Since 2016, the City has repeatedly requested that interim remedial measures ("IRMs") be implemented to remediate the Contamination and halt the discharge of contaminants from Rec Pond to Silver Stream.

Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 116 of 136

234.   While in 2021, an IRM was installed to treat the discharge of contaminants from Rec Pond, that system has only been partially successful, and often is bypassed in heavy rainfall events.

## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, AND ENTERPRISE LIABILITY

235.   Defendants in this action are manufacturers that control a substantial share of the market for AFFF/Component Products containing PFAS and/or their chemical precursors in the United States and are jointly responsible for the contamination of the groundwater and surface water in the City Watershed, including on the City Property.  Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF/Component Products at issue in this Complaint.

236.   Because PFAS is fungible, upon information and belief it is impossible to identify the exact Defendant who manufactured any given AFFF/Component Product containing PFAS, and/or their chemical precursors found free in the air, soil or groundwater, and each of these Defendants participated in a territory-wide and U.S. national market for AFFF/Component Products during the relevant time.

237.   Because precise identification of the specific manufacturer of any given AFFF/Component Product that was a source of the PFAS found in the City Watershed and the City Water System and on the City Property is nearly impossible, given certain exceptions, Plaintiff must pursue all Defendants, jointly and severally.

238.   Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/Component Products containing PFOS and PFOA, at Plaintiff's expense, and to attempt to avoid liability.

41

239.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

240.    Enterprise and/or market share liability attaches to all the named Defendants for casting defective products into the stream of commerce.

## FIRST CAUSE OF ACTION
## FOR DEFECTIVE DESIGN

241.    Plaintiff repeats and realleges paragraphs 1 through 240 of this Complaint, as if set forth in this paragraph at length.

242.    As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiff, and not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

243.    Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

    a.  PFAS causes extensive surface water, groundwater, soil and sediment contamination, even when used in its foreseeable and intended manner;

    b.  Even at extremely low levels, PFAS render drinking water unfit for consumption;

    c.  PFAS poses significant threats to public health; and

    d.  PFAS create real and potential environmental damage.

244.    Defendants knew of these risks and failed to use reasonable care in the design of their AFFF/Component Products.

42

245.    AFFF containing PFOS, PFOA, and/or their chemical precursors poses a greater danger to the environment and to human health than would be expected by ordinary persons such as Plaintiff and the general public.

246.    At all times, Defendants were capable of making AFFF/Component Products that did not contain PFOS, PFOA, and/or their chemical precursors. Thus, reasonable alternative designs existed which were capable of preventing Plaintiff's injuries.

247.    The risks posed by AFFF containing PFOS, PFOA, and/or their chemical precursors far outweigh the products' utility as a flame-control product.

248.    The likelihood that Defendants' AFFF/Component Products would be spilled, discharged, disposed of, or released into the environment and the contamination of its drinking water, which has tested positive for PFAS, far outweighed any burden on Defendants to adopt an alternative design, and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

249.    As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, the City Watershed, the City Water System and the City Property have become contaminated.

250.    Defendants knew that it was substantially certain that their acts and omissions described above would contaminate the City Watershed, the City Water System and the City Property.

251.    Defendants are therefore strictly, jointly and severally liable for all of the damages to the City proximately caused by such wrongful acts and omissions, including damages to the

43

City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

252. Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

253. Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the damages to Plaintiff, disregarding their protected rights, such that the imposition of punitive damages is warranted.

254. Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS would not be released into the environment and inevitably contaminate the City Watershed, the City Water System and the City Property.

## SECOND CAUSE OF ACTION
## FOR FAILURE TO WARN

255. Plaintiff repeats and realleges paragraphs 1 through 254 of this Complaint, as if set forth in this paragraph at length.

256. As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants had a duty to provide adequate warnings of the risks of these products to all persons whom its product might foreseeably harm, including Plaintiff.

257. Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

  a. PFAS causes extensive surface water, groundwater, soil and sediment contamination, even when used in its foreseeable and intended manner;

44

    b.   Even at extremely low levels, PFAS render drinking water unfit for consumption;

    c.   PFAS poses significant threats to public health; and

    d.   PFAS create real and potential environmental damage.

258.   Defendants knew of the health and environmental risks associated with their AFFF/Component Products and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with their products or an instruction that would have avoided Plaintiff's injuries.

259.   Despite Defendants' knowledge of the environmental and human health hazards associated with the use and/or disposal of their AFFF/Component Products in the vicinity of drinking water supplies, including PFAS contamination of the drinking supplies, Defendants failed to issue any warnings, instructions, recalls, or advice regarding their AFFF/Component Products to Plaintiff, other governmental agencies or the public.

260.   As a direct and proximate result of Defendants' failure to warn, Plaintiffs' water supply has been, and continues to be, contaminated with PFAS in varying amounts over time, causing Plaintiffs significant injuries and damages. Further, this contamination led to the exposure of Plaintiffs to toxins and increased their probabilities of numerous diseases as more fully set forth above.

261.   Defendants knew that it was substantially certain that their acts and omissions described above would contaminate Plaintiffs water supply with PFAS in varying amounts, causing Plaintiffs significant injuries and damages.

262.   Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiff's customers' health and safety, and/or Plaintiff's property rights.

45

Case 7:23-cv-07370-KMK    Document 1-1    Filed 08/18/23    Page 121 of 136

263. Defendants are therefore strictly, jointly and severally liable for all of the damages to the City proximately caused by such wrongful acts and omissions, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

264. Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

### THIRD CAUSE OF ACTION
### FOR NEGLIGENCE

265. Plaintiff repeats and realleges paragraphs 1 through 264 of this Complaint, as if set forth in this paragraph at length.

266. As manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants owed a duty to Plaintiff and to all persons whom its products might foreseeably harm and to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PFAS-containing AFFF.

267. Defendants owed a duty to Plaintiff to act reasonably and not place inherently dangerous AFFF/Component Products into the marketplace when its release into the air, soil, and water was imminent and certain.

268. Defendants knew or should have known that PFAS were leaching from AFFF used for fire protection, training, and response activities.

269. Defendants knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate water supplies if released into the environment.

46

270.    Defendants knew or should have known that the manner in which they were designing, manufacturing, marketing, distributing, and selling their AFFF/Component Products would result in contamination of the City Watershed, the City Water System and the City Property.

271.    Despite the fact that Defendants knew or should have known that PFAS are toxic, can contaminate water resources and are carcinogenic, Defendants negligently:

    a.  designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors;

    b.  issued deficient instructions on how their AFFF/Component Products should be used and disposed of, thereby permitting PFAS to contaminate the surface waters and groundwater in and around the City;

    c.  failed to recall and/or warn the users of their AFFF/Component Products of the dangers of groundwater contamination as a result of standard use and disposal of their products;

    d.  failed and refused to issue the appropriate warning and/or recalls to the users of their AFFF/Component Products; and

    e.  failed to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

272.    The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiff was minimal, as the practical consequences of placing this burden on the Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products.

47

273.    As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products, and to take steps to eliminate, correct, or remedy any contamination they caused.

274.    Under the Clean Water Act and ECL Article 17, discharge of PFAS into the waters of the State of New York, including groundwater, or waters of the United States, is prohibited unless specifically permitted, but there was no permit to discharge PFAS into the City Watershed or Washington Lake.

275.    Discharges of "polluted liquid," including PFAS, into the City Watershed and Washington Lake is prohibited by the regulations of the New York State Department of Health. 10 N.Y.C.R.R. §133.2(e) and (f).

276.    Pursuant to ECL §37-0107, "no person shall store or release to the environment substances hazardous or acutely hazardous to public health, safety or the environment in contravention of rules and regulations promulgated pursuant hereto," but the PFAS continues to be discharged into the City Watershed in contravention of that statutory prohibition.

277.    As a direct and proximate result of Defendants' negligence, Plaintiff's property has been contaminated with PFAS, in violation of the above prohibitions.

278.    Defendants knew that it was substantially certain that their acts and omissions described above would contaminate the City Watershed, the City Water System and the City Property.

279.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of City Water Users, and the City's property rights, proximately resulting in damages to the City.

48

280. Defendants are therefore jointly and severally liable for all of the damages to the City proximately caused by such negligence, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

281. Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

## FOURTH CAUSE OF ACTION
## FOR TRESPASS

282. Plaintiff repeats and realleges paragraphs 1 through 281 of this Complaint, as if set forth in this paragraph at length.

283. Plaintiff is the owner, operator, and actual possessor of the City Property, real property and improvements used for collecting, treating and disseminating drinking water.

284. Defendants designed, manufactured, distributed, marketed, and sold AFFF/Component Products with the actual knowledge and/or substantial certainty that AFFF containing PFOS, PFOA, and/or their chemical precursors would, through normal use, release PFAS that would migrate into surface waters and groundwater, causing contamination.

285. Defendants intentionally designed, manufactured, distributed, marketed, and sold AFFF/Component Products in a manner that caused PFAS to contaminate Plaintiff's property.

286. Defendants knew or should have known that PFAS would migrate to or otherwise enter the nearby groundwater, the City Watershed, Washington Lake, and the City Water System.

287. The Contamination was the inevitable result of those intentional acts and omissions.

288. Defendants failed to prevent, remediate, or otherwise stop the Contamination.

49

289.    Defendants, by their acts and omissions, or the acts or omissions of their agents, employees or predecessors, have interfered with the rights of the City to exclusive possession of Washington Lake and the City Property, and threaten to do so in the future.

290.    As a direct and proximate result of Defendants' trespass, Plaintiff has suffered and continues to suffer property damage requiring investigation, remediation, and monitoring costs.

291.    Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of property, including surface waters and groundwater collected for drinking.

292.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of City Water Users and the Plaintiff's property rights, proximately causing damages to the City.

293.    Defendants are therefore jointly and severally liable for all of the damages to the City proximately caused by such trespass, including damages to the City Watershed and Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

294.    Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

**FIFTH CAUSE OF ACTION AGAINST THE DUPONT ENTITIES FOR VIOLATION OF THE UNIFORM FRAUDULENT CONVEYANCE ACT**

295.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 294 of this Complaint as if set forth in this paragraph at length.

50

296.    Plaintiff seeks equitable and other relief pursuant to the Uniform Fraudulent Conveyance Act (UFCA) as adopted by the State of New York at NY Debtor and Creditor Law ("Dr. & Cr. Law") Article 10, against the DuPont Entities (DuPont, Chemours, Chemours FC, Corteva, and DuPont de Nemours, Inc.).

297.    The UFCA provides a "conveyance made" or "obligation incurred" is "fraudulent as to creditors as to both present and future creditors," and "without regard to his actual intent," when: (a) "the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital," Dr. & Cr. Law §274; (b) "the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature," Dr. & Cr. Law §275; or (c) made or incurred "with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors," Dr. & Cr. Law §276.

298.    The DuPont Entities: (a) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; (b) intended to incur, or believed or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due; and (c) acted with actual intent to hinder, delay and defraud Plaintiff and other potential creditors.

299.    The DuPont Entities engaged in acts in furtherance of a scheme to transfer the assets of DuPont out of the reach of parties such as Plaintiff that have been damaged as a result of the DuPont Entities' conduct, omissions, and actions described in this Complaint.

300.    It is primarily DuPont, rather than Chemours, that for decades manufactured, marketed, distributed and/or sold AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors with the superior knowledge that they were toxic, mobile, persistent,

51

bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate drinking water supplies.

301.    As a result of the transfer of assets and liabilities described in this Complaint, the DuPont Entities have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

302.    At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

303.    The DuPont Entities acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

304.    At all times relevant to this action, the claims, judgment and potential judgments against Chemours have potentially exceeded its ability to pay.

305.    Pursuant to Dr. & Cr. Law Article 10, Plaintiff seeks avoidance of the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold the DuPont Entities liable for any damages or other remedies that may be awarded by the Court or jury to Plaintiff in this action.

306.    Plaintiff further seeks all other rights and remedies that may be available to it under UFCA, including prejudgment remedies as available under applicable law, as may be necessary to

fully compensate Plaintiff for the damages and injuries it has proximately suffered as alleged in this Complaint.

**SIXTH CAUSE OF ACTION**
**FOR PUBLIC NUISANCE**

307. Plaintiff repeats and realleges the allegations of paragraphs 1 though 306 of this Complaint, as if set forth in this paragraph at length.

308. Plaintiff is the owner of land, easements, and water rights that permit it to extract surface and groundwater to provide water to the City Water System and City Water Users.

309. Defendants' intentional, negligent, and/or reckless conduct, as alleged herein, has resulted in contamination of the City Watershed, the City Water System and the City Property with PFAS, human carcinogens that cause adverse human health effects.

310. Defendants' manufacture, distribution, sale, supply, and marketing of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors, was unreasonable because Defendants had knowledge of the unique and dangerous chemical properties of PFAS and knew that contamination of surface waters and groundwater supply wells was substantially certain to occur, but failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

311. The Contamination caused, contributed to, and/or maintained by Defendants substantially and unreasonably interfered with, and continues to interfere with Plaintiff's use and enjoyment of its property.

312. Each Defendant has caused, contributed to, and/or maintained such nuisance, and is a substantial contributor to such nuisance.

313. As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has suffered, is suffering, and will continue to suffer substantial damages related

53

to PFAS contamination of the Impacted Systems, including but not limited to devaluation, capital costs, legal costs, and sampling costs.

314.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of the City Watershed, City Water System and the City Property.

315.    Defendants (including their officers, agents, servants, and/or employees), by causing the Contamination, have interfered and continue to interfere with the rights common to all, including groundwater, surface waters including the City Watershed and Washington Lake, the City Water System, and public lands, and have caused an imminent and substantial endangerment to health and the environment.

316.    The City, as a property owner of the City Property and operator of the City Water System, has sustained special damages from this public nuisance.

317.    The Contamination interferes with the public's and the City's use and/or enjoyment of City Property, and the water in the City Watershed and Washington Lake, in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

318.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on surface water and groundwater resources, public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

319.    Defendants are therefore jointly and severally liable for all of the damages to the City proximately caused by such public nuisance, including damages to the City Watershed and

Washington Lake, the City Water System and the City Property, and are responsible for investigation, cleanup, and removal of the Contamination.

320.    Further, this Court should issue an injunction requiring Defendants to immediately investigate, remove sources of Contamination and remediate the Base Property, the Airport Property, the City Property, the sediment and waters of the City Watershed, including Rec Pond and Silver Stream, and the sediment and waters of Washington Lake.

## SEVENTH CAUSE OF ACTION FOR EQUITABLE AND/OR IMPLIED INDEMNIFICATION

321.    The City repeats and realleges paragraphs 1 through 320 of this Complaint, as if set forth in this paragraph at length.

322.    Defendants, including their officers, agents, servants, employees, and/or lessees, had a non-delegable duty to the City and the public to prevent, clean up, or ensure against the Contamination and to prevent the release and discharge of PFAS into the City Watershed.

323.    As a result of the breach of this duty by Defendants, including their officers, agents, servants, employees, and/or lessees, the defendants are responsible for the City's expenses and damages in investigation, remediation, cleanup, and removal of, and response to the Contamination, and as a result, the Defendants should, in equity, indemnify the City for its expenses, costs, and damages.

## EIGHTH CAUSE OF ACTION FOR RESTITUTION

324.    The City repeats and realleges paragraphs 1 through 323 of this Complaint, as if set forth in this paragraph at length.

325.    It would be against equity and good conscience to permit the Defendants to pass the burden of cleaning up the Contamination to the City, and to have had the benefit of enjoyment

55

of profits from the manufacture and sale of AFFF, free of any responsibility for investigation, remediation, cleanup, and removal of, and response to, the Contamination.

326.    Therefore, Defendants should make restitution to the City for all of its expenses, costs, and damages, including attorneys' fees and costs incurred in defending itself from the City Water User Claims.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff City demands Judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

(1)    Granting Permanent Injunctions to abate the public nuisance and imminent and substantial endangerment to health and the environment as follows:

(a)    Directing Defendants to immediately install effective IRMs to prevent PFAS and other Contamination from entering the City Watershed, Washington Lake and the City Water Supply, including surface water, groundwater, and sediments;

(b)    Directing that all IRMs treat for all PFAS to Method Detection Limits;

(c)    Directing Defendants to fully investigate (including a hydrology study), identify sources of, remove and remediate the Contamination of the groundwater, surface water, soil and sediments of the Facilities, Washington Lake, Silver Stream, and other related water bodies in the City Watershed;

(d)    Directing Defendants to pay for costs incurred by the City to continue to receive clean water from the Catskill Aqueduct and Brown's Pond until all abatement, removal and remediation is complete, and providing safe, contaminant and/or pollutant free water transported from an acceptable source to the City Water Treatment Plant for filtration during any shutdown of the Catskill Aqueduct by NYCDEP;

56

(e)      Directing Defendants to pay for the City's independent consultants to perform independent analysis of all IRMs and remedial measures;

(f)      Directing Defendants to pay for all necessary investigation and remedial costs; and

(2)      Awarding the City compensatory damages and other appropriate damages in amounts to be determined by the evidence at trial and allowed by law;

(3)      Declaring that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the property rights of the City and the health and safety of City Water users;

(4)      Barring the transfer of DuPont's liabilities for the claims brought in this Complaint;

(5)      Directing that Defendants defend and indemnify the City in the City Water User Claims, and compensate it for its costs and attorneys' fees.

(6)      Awarding the City attorneys' fees and costs;

(7)      Awarding punitive damages in an amount to be determined at trial;

(8)      Awarding Pre-judgment and post-judgment interest;

(9)      Granting such further relief as the Court deems just and proper.

Dated: August 17, 2023

Respectfully submitted,

**KNAUF SHAW LLP**

By: /s/ Amy K. Kendall
Alan J. Knauf, Esq.,
Amy K. Kendall, Esq., and
Melissa M. Valle, Esq. of Counsel
2600 Innovation Square
100 South Clinton Avenue
Rochester, New York 14604
(585) 546-8430

57

STATE OF NEW YORK
SUPREME COURT      ORANGE COUNTY

CITY OF NEWBURGH,

> **AMENDED SUMMONS**

*Plaintiff,*

> Index No. EF004436-2023

*v.*

AGC, INC., f/k/a Asashi Glass Co., AGC CHEMICALS
AMERICAS INC., AMEREX CORPORATION,
ARCHROMA U.S. INC., ARKEMA INC., BASF
CORPORATION, individually and as successor in interest
to Ciba Inc., CARRIER GLOBAL CORPORATION,
CHEMDESIGN PRODUCTS INC., CHEMICALS, INC.,
CLARIANT CORPORATION, individually and as
successor in interest to Sandoz Chemical Corporation,
CORTEVA, INC., individually and as successor in interest
to DuPont Chemical Solutions Enterprise, DEEPWATER
CHEMICALS, INC., DUPONT DE NEMOURS INC.,
individually and as successor in interest to DuPont Chemical
Solutions Enterprise, DYNAX CORPORATION, E. I.
DUPONT DE NEMOURS AND COMPANY, individually
and as successor in interest to DuPont Chemical Solutions
Enterprise, NATION FORD CHEMICAL COMPANY,
THE CHEMOURS COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, THE CHEMOURS COMPANY FC, LLC,
individually and as successor in interest to DuPont Chemical
Solutions Enterprise, and DOE DEFENDANTS 1-20,
fictitious names whose present identities are unknown

*Defendants.*

To the above-named Defendants:

**YOU ARE HEREBY SUMMONED** to serve an Answer to the annexed Complaint on

the attorneys for Plaintiff within 20 days after the service of this Summons, exclusive of the day

of service (or within 30 days after the service is complete if this Summons is not personally

delivered to you within the State of New York); and in case of your failure to appear, judgment will be taken against you by default for the relief demanded in the Complaint.

Orange County is designated as the venue of this action because it is the location of Plaintiff, a municipal corporation with an address of 83 Broadway, Newburgh, New York 12550, the location of events or omissions giving rise to the claim occurred, and the location of the subject real property in Orange County.


Dated:  Rochester, New York
        August 17, 2023

_Amy K Kendall_

**KNAUF SHAW LLP**
*Attorneys for Plaintiff*
Alan J. Knauf, Esq.,
Amy K. Kendall, Esq., and
Melissa Valle, Esq., of Counsel
2600 Innovation Square
100 South Clinton Avenue
Rochester, New York 14604
Tel: (585) 546-8430
aknauf@nyenvlaw.com
akendall@nyenvlaw.com
mvalle@nyenvlaw.com

To:
AGC, INC.
1-5-1, Marunouchi, Chiyoda-ku
Tokyo 100-8405 Japan

AGC CHEMICALS AMERICAS INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street Wilmington, DE 19801

AMEREX CORPORATION
James M. Proctor II
2900 Highway 280
Suite 300
Birmingham, AL 35223

ARCHROMA U.S. INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

ARKEMA INC.
900 First Avenue
King of Prussia, PA 19406

BASF CORPORATION
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CARRIER GLOBAL CORPORATION
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CHEMDESIGN PRODUCTS INC.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, New Castle, DE, 19808

CHEMICALS, INC.
 c/o Ashok K. Moza
12321 Hatcherville
Baytown, TX 77520

CLARIANT CORPORATION
c/o Corporation Service Company
8040 Excelsior Drive, Suite 400
Madison, WI 53717

CORTEVA, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DEEPWATER CHEMICALS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DUPONT DE NEMOURS INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DYNAX CORPORATION
c/o Corporate Systems LLC
3500 S. Dupont Highway
Dover, DE 19901

E. I. DUPONT DE NEMOURS AND COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

NATION FORD CHEMICAL COMPANY
c/o John A. Dickson, IV
2300 Bank Street
Fort Mill, SC 29715

THE CHEMOURS COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

THE CHEMOURS COMPANY FC, LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801